**BETHLEHEM STEEL CORPORATION, Plaintiff,**

v.

**J. Coleman TIDWELL, Trustee, Defendant.**

**Civ. A. No. 86–70–1–MAC (WDO).**

United States District Court, M.D. Georgia, Macon Division.

Nov. 4, 1986.

Walter H. Bush, Jr., Macon, Ga., for plaintiff.

Susan A. Cahoon, Atlanta, Ga., for defendant.

OWENS, Chief Judge:

This case comes to the court on appeal from the order of the United States Bankruptcy Court for the Middle District of Georgia entered on December 31, 1985, 56 B.R. 509, and later amended on February 6, 1986, which declared that certain payments made by the debtor Georgia Steel, Inc. (Georgia Steel) to defendant Bethlehem Steel Corporation (Bethlehem) were avoidable by the trustee because they were preferential transfers, as that term is defined under 11 U.S.C. § 547(b). In passing on an appeal from the bankruptcy court, the district court must make an independent determination on the legal issues, but must accept the bankruptcy judge's findings of fact unless those findings are clearly erroneous. *See* Bankr.R. 8013 (West 1984); *In the matter of Gregory Mobile Homes, Inc.*, 347 F.Supp. 528, 529 (M.D.Ga.1972); and *Stewart v. Jones*, 35 B.R. 392 (D.C.Ala. 1983). With this standard in mind, the court will review the bankruptcy court's findings of fact and will apply the relevant law to these facts.

*Factual Background*

On September 3, 1981, Georgia Steel filed a Chapter 11 petition. On October 29, 1982, the bankruptcy court converted Georgia Steel's case to a Chapter 7 proceeding. At this time a trustee was appointed to the case. The pertinent facts to this appeal arose out of the business dealings between Bethlehem, Georgia Steel, and the Brown & Williamson Tobacco Company (Brown & Williamson).

Brown & Williamson contracted with Georgia Steel to make certain improvements to its realty in Macon, Georgia. Georgia Steel then approached Bethlehem about supplying certain material for the Brown & Williamson job. Bethlehem was hesitant about giving unsecured credit to Georgia Steel to enable it to purchase the steel required for the work. Georgia Steel and Bethlehem finally reached an agreement whereby Georgia Steel would purchase the steel required for the Brown & Williamson project on a "pay as get paid" basis. This "pay as get paid" arrangement required Georgia Steel to pay Bethlehem within fifty-five days after Bethlehem made each shipment of steel.[1] Bethlehem agreed to this arrangement, at least in part, because of Georgia Steel's assurances that the Georgia lien laws would adequately secure these sales.

Georgia Steel received the steel for the work at the Brown & Williamson site in a series of four shipments occurring during the months of April and May of 1981.[2] Bethlehem demanded payment for this steel by invoice for each shipment on April 6, 1981, April 10, 1981, April 20, 1981, and May 19, 1981.[3] This steel was then pro-

---

1. Georgia Steel and Bethlehem arrived at this fifty-five day figure by allowing ten days for the shipment of steel from Bethlehem to Georgia Steel, thirty days for Georgia Steel to fabricate it, and fifteen days for payment from Brown & Williamson to Georgia Steel.

2. The following is a summary of Bethlehem's shipping dates, invoicing dates and numbers, and the amounts invoiced for the Brown & Williamson job:

| Shipment Date | Invoice Date and No. | Amt. Invoiced |
|---|---|---|
| April 2, 1981 | April 6, 1981 #104–00320 | $21,325.26 |
| April 8, 1981 | April 10, 1981 #104–0067 | $23,654.28 |
| April 15, 1981 | April 20, 1981 #104–01122–1/2 | $19,346.62 |
| April 15, 1981 | April 20, 1981 #104–01122–2/2 | $ 1,806.84 |
| May 17, 1981 | May 19, 1981 #104–02959 | $23,750.62 |

3. *See,* note 2, *supra.*

cessed by Georgia Steel and subsequently incorporated into the real property of Brown & Williamson.

Georgia Steel then requested payment from Brown & Williamson for the work it had completed. The dates on which Georgia Steel applied to Brown & Williamson for payment and the amounts requested at those times were:

(1) On May 15, 1981, two payments were requested in the amounts of $91,423.00 and $46,793.00;

(2) On June 9, 1981, payment in the amount of $35,410.66 was requested;

(3) On June 26, 1981, payment in the amount of $35,756.34 was requested;

(4) On August 7, 1981, two payments were requested in the amounts of $47,-539.00 and $35,165.00;

(5) On August 12, 1981, payment in the amount of $30,487.00 was requested;

(6) On November 3, 1981, payment in the amount of $51,123.00 was requested; and

(7) On December 28, 1981, payment in the amount of $23,023.00 was requested.

Brown & Williamson subsequently paid Georgia Steel for the work done in a series of payments which were disbursed between May 19, 1981, and January 4, 1982.[4] Brown & Williamson did not direct that a specific portion of these payments be paid to or held by Georgia Steel in trust for Bethlehem, nor did Georgia Steel's bank statements reveal that these funds were being placed in a special account from which Bethlehem was to be paid. Rather, the funds were merely placed in Georgia Steel's general banking account. Georgia Steel then paid Bethlehem from this account. Payments for the steel that was incorporated into the Brown & Williamson site were made to Bethlehem on June 6, 1981, June 10, 1981, June 19, 1981, and July 16, 1981.[5] All of these payments were made within ninety days after the last lienable item was delivered to the Brown & Williamson site.

Prior to making its final payment to Georgia Steel for the work that had been done, Brown & Williamson required, on September 25, 1981, that Bethlehem sign a document waiving its right to attach liens on the Brown & Williamson property. On December 16, 1981, Georgia Steel also signed a document at the request of Brown & Williamson that stated it had paid all materialmen for the work done at the Brown & Williamson site. After these documents were signed, Brown & Williamson made its final payment to Georgia Steel on January 4, 1982.

The bankruptcy court found that the payments made by Georgia Steel to Bethlehem for the materials it supplied to the site, amounting to $89,163.62, were preferential transfers under 11 U.S.C. § 547(b), and were thus avoidable by the trustee. In order to decide whether this decision was correct, the court must look at the relevant bankruptcy law in this area.

---

4. Pursuant to Georgia Steel's applications for payments, Brown & Williamson made payments to Georgia Steel as follows:

| Date | Check No. | Amount | Date Debtor Deposited |
| --- | --- | --- | --- |
| May 19, 1981 | #06541 | $138,216.00 | May 20, 1981 |
| June 16, 1981 | #07415 | $ 35,410.66 | June 18, 1981 |
| July 2, 1981 | #07467 | $ 35,756.34 | July 6, 1981 |
| August 11, 1981 | #07476 | $ 82,704.00 | August 12, 1981 |
| November 9, 1981 | #26429 | $ 51,123.00 | ...................... |
| January 4, 1982 | $36066 | $ 23,023.00 | ...................... |

5. More specifically, the payment schedule as between Georgia Steel and Bethlehem was as follows:

| Check No. and Date | Amount | For Shipment | Date Bank Paid Check |
| --- | --- | --- | --- |
| #57166 June 6, 1981 | $21,325.26 | April 2, 1981 | June 11, 1981 |
| #57167 June 10, 1981 | $23,654.28 | April 8, 1981 | June 15, 1981 |
| #57384 June 19, 1981 | $20,433.46 | April 15, 1981 | July 6 or 7, 1981 |
| #57594 July 3, 1981 | $ 674.69 | Interest charges on April 6 and 10, 1981, invoices | July 15, 1981 |
| #57740 July 16, 1981 | $23,750.62 | May 17, 1981 | July 22 or 23, 1981 |
| #57869 July 27, 1981 | $ 647.23 | Interest charges on April 20, 1981, invoice | August 14, 1981 |

## Conclusions

At issue in this case is whether a contractor has any property rights in payments made to it by an owner of real estate improved by the contractor if the payments are made to satisfy materialmen's claims that are either already secured by valid liens on the owner's property, or are capable of being secured by a valid lien at the time the payment is made. The resolution of this question is important because if the contractor has property rights in such payments, this court must then determine whether payments made by a contractor to its materialmen in order to satisfy their claims are avoidable by the trustee under 11 U.S.C. Section 547(b).[6] This section provides that a bankruptcy trustee may avoid any transfer of *property of the debtor* if he or she can establish that the transfer was made:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between 90 days and one year before the date of the filing of the petition if such creditor, at the time of such transfer—

(i) was an insider; and

(ii) had reasonable cause to believe the debtor was insolvent at the time of such transfer; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

6. Since these payments were made in 1981, section 547, as it read prior to the 1984 amend-

11 U.S.C.A. § 547(b) (West 1979) (emphasis added). Furthermore, unless the provisions of 11 U.S.C.A. § 547(c) exempt the transfer from section 547(b)'s coverage, the transferee must return to the debtor the property transferred.

Bethlehem contends that the payments Brown & Williamson made to Georgia Steel for the material that was supplied to the site by Bethlehem did not constitute property of the debtor, and, therefore, the payments made by Georgia Steel to Bethlehem for these supplies were not transfers subject to the provisions of section 547(b). In the alternative, Bethlehem argues that even if these payments constituted property of the debtor, section 547(c) would exempt these transfers from section 547(b)'s coverage. In order to decide these issues, the court must analyze how state law would characterize the property interests involved in this appeal.

The trustee in bankruptcy succeeds only to the title and rights in property that the debtor possessed. *South Central Livestock Dealers, Inc. v. Security Stock Bank of Hadley, Texas,* 614 F.2d 1056, 1061 (5th Cir.1980). Where bankruptcy law deals with property rights regulated by state law, federal courts will look to the state law and state court decisions to determine what are those property rights. *Chicago Board of Trade v. Johnson,* 264 U.S. 1, 44 S.Ct. 232, 68 L.Ed. 533 (1923). This court, therefore, must look to the state law of Georgia to determine whether Georgia Steel had a property interest in the payments it received from Brown & Williamson.

In order to determine what property interest Georgia Steel maintained in these payments, it is necessary to ascertain what rights and duties are given to the parties in this case under Georgia law. At the time Bethlehem made these sales to Georgia Steel, Georgia's lien laws provided in pertinent part:

(a) The following persons shall each have a special lien on the real estate, factories,

ments to it, would apply. 11 U.S.C.A. § 547 (West 1979).

railroads, or other property for which they furnish labor, services, or materials:

\* \* \* \* \* \*

(2) all contractors, all subcontractors and all materialmen furnishing material to subcontractors, and all laborers furnishing labor to subcontractors, materialmen, and persons furnishing material for the improvement of real estate;

\* \* \* \* \* \*

(b) When work done or material ... furnished for the improvement of real estate is done or furnished upon the employment of a contractor or some person other than the owner ..., the lien given by this Code section shall attach to the real estate which is improved ..., against the true owner of the real estate for the amount of the work done or material furnished or for the value of the services furnished or performed, unless the true owner shows that the lien has been waived in writing or produces the sworn statement of the contractor or other person at whose instance the work was done or material was furnished or such services were furnished or rendered, which statement declares that the agreed price or reasonable value thereof has been paid. In no event shall the aggregate amount of liens set up by this Code section exceed the contract price of the improvements made.... As used in this subsection, the words "contractor or other person at whose instance the work

was done or material was furnished" shall not include subcontractors. The sworn statement of the contractor or other person at whose instance the work was done or material was furnished shall operate to dissolve all liens given by this Code section.

O.C.G.A. § 44–14–361 (1982). Georgia law further provides that a contractor can be held criminally liable for failing to pay materialmen for the work they have done on the real property.[7] In light of these rights conferred upon materialmen and the duties imposed upon contractors, the question this court must answer is: Does Georgia law recognize any type of doctrine that would prevent a contractor from acquiring property rights in payments made to it by the owner of improved realty when such payments represent the amount owed to the contractor's materialmen for improvements made to the owner's real property? Bethlehem contends that the constructive trust fund doctrine is recognized in Georgia, and that this doctrine would impress a trust on such payments to prevent the contractor from having a property interest in this money. While not binding precedent, the court finds the discussion of this doctrine and its availability under Georgia law by the Fifth Circuit Court of Appeals in *United Parcel Service v. Websten Industries, Inc.*, 794 F.2d 1005 (5th Cir.1986), to be an accurate summary of this area of the law. Accordingly, it is set forth below in relevant part and made a part of this opinion:

---

**7.** *See* O.C.G.A. § 16–8–15 (1982) which states: (a) Any architect, landscape architect, engineer, contractor, subcontractor, or other person who with intent to defraud shall use the proceeds of any payment made to him on account of improving certain real property for any other purpose than to pay for labor or service performed on or materials furnished by his order for this specific improvement while any amount for which he may be or become liable for such labor, services, or materials remains unpaid commits a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than five years or upon the recommendation of the jury or in the discretion of the trial judge, punished for a misdemeanor, provided that, in addition to the above sanctions, where a corporation's agent acts within the scope of his office or employment and on behalf of the corporation and with intent to defraud uses such proceeds for purposes other than for property improvements or where a corporation's board of directors or managerial official, the latter acting within the scope of his employment and on behalf of the corporation recklessly tolerates or, with intent to defraud, authorizes, requests, or commands the use of such proceeds for purposes other than for property improvements, the corporation commits a felony and, upon conviction thereof, shall be punished by a fine of not less than $1,000.00 nor more than $5,000.00.

(b) A failure to pay for material or labor furnished for such property improvements shall be prima-facie evidence of intent to defraud.

In some states, the construction trust fund doctrine has been codified expressly by state law. *See e.g., Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979) (interpreting Michigan law); *Carrier Corp. v. J.E. Schecter Corp.,* 347 F.2d 153 (2d Cir.), *cert. denied,* 382 U.S. 904, 86 S.Ct. 239, 15 L.Ed.2d 157 (1965) (interpreting New Jersey law); *cf. Georgia Pacific Corp. v. Sigma Service Corp.,* 712 F.2d 962 (5th Cir.1983) (interpreting Arkansas and Mississippi law and concluding that statutes do not authorize construction fund theory). In other states, the construction trust fund theory has been based primarily on equitable principles; although state law has been relied upon by the courts as general support for the doctrine, it has been developed despite the absence of laws explicitly establishing the theory. *See e.g., United States v. Durham Lumber Co.,* 363 U.S. 522, 80 S.Ct. 1282, 4 L.Ed.2d 1371 (1960) (North Carolina law); *Keenan Pipe & Supply Co. v. Shields,* 241 F.2d 486, 489 (9th Cir.1956); *Mickelson v. Aetna Casualty & Surety Co.,* 452 F.2d 1219, 1225 (8th Cir.1971); *In re D & B Electric, Inc.,* 4 B.R. 263 (Bankr.W.D. Ky.1980) (Kentucky law).

If the construction trust fund theory is valid in Georgia, it must be by virtue of equitable principles and indirect statutory support, for Georgia has no statute which expressly codifies the trust fund theory. Nevertheless, this court has previously held, in a decision which was rendered before the enactment of the Georgia UCC,[4] that when "the owner deposits in the bankruptcy court the unexpended balance of the [construction] contract price, he deposits it to the extent necessary to discharge the liens, *not as money of the estate, but as money of the lien claimants.*" *Cutler-Hammer, Inc. v. Wayne,* 101 F.2d 823, 825 (5th Cir.), *cert. denied,* 307 U.S. 635, 59 S.Ct. 1031, 83 L.Ed. 1517 (1939) (emphasis added). The Bank contends that reliance on *Cutler-Hammer* as support for the construction trust fund theory is inapt, as that case involved a dispute between a subcontractor's materialman's lien and a general unsecured creditor. This observation is correct but irrelevant. The critical issue resolved by *Cutler-Hammer* was that the money deposited into the court never becomes part of the debtor's estate; it therefore matters not whether a creditor of the estate is secured or unsecured as neither will have a claim to that which never enters the estate.

The more difficult issue is whether the construction trust fund theory sketched by this court in *Cutler-Hammer* remains viable under Georgia law following the enactment of the Georgia UCC. We conclude that it does. Support for the equitable principles which undergird the theory appears in numerous decisions of the Georgia courts, both pre- and post–1978. For example, in *Short & Paulk Supply Co. v. Dykes,* 120 Ga.App. 639, 171 S.E.2d 782 (1969), the court, after observing that "[i]t is the owner's [i.e., UPS's] responsibility to see to it that the payments which he makes on the construction contract price are properly disbursed by the contractor to those having valid claims for labor and materials," *id.,* 171 S.E.2d at 786, expressly embraced the trust fund doctrine:

> If he [the contractor] received the full contract price for the job he became a trustee of the funds for the purpose of disbursing them properly to those who held valid claims for labor and materials....

*Id.,* 171 S.E.2d at 788. Similarly, in *Scott v. Williams,* 111 Ga.App. 735, 143 S.E.2d 16 (1965), the court stressed the owner's obligation to insure that the subcontractors get paid by the general contractor. Indeed, while claims of the subcontractors remain outstanding, the owner is entitled to withhold payment from the general contractor. *Id.,* 143 S.E.2d at 18.[5] In addition the court observed that the purpose of the Georgia lien statute is to "secur[e] the payment of the contract price, and creat[e] the fund out of which

the subcontractors and laborers may be paid." *Id.*, 143 S.E.2d at 17.

The duty of the owner to insure that the subcontractors get paid has apparently not been affected by the 1978 amendments to the Georgia UCC. *See e.g., Jones Mercantile Co. v. Lyn-Har, Inc.*, 245 Ga. 812, 267 S.E.2d 251 (1980); *Henderson v. Mitchell Engineering Co.*, 158 Ga.App. 306, 279 S.E.2d 750, 752 (1981); *Arington v. Andrews*, 152 Ga. App. 572, 263 S.E.2d 491, 492 (1979). This frequent reiteration of the right of the subcontractors to be paid is especially important because it is this fundamental obligation to subcontractors and materialmen which has largely supported the development of the construction trust fund theory in states where there is no explicit statutory authorization. *See e.g., In re Tonyan Construction Co.*, 28 B.R. 714, 724–25 (Bankr.N.D.Ill.1983) (Illinois law imposing criminal sanctions for general contractor's failure to pay funds due to subcontractors and "principles of equity and justice" support conclusion that money deposited into the court is a trust fund for the benefit of subcontractors.); *In re D & B Electric, Inc.*, 4 B.R. 263 (Bankr.W.D.Ky.1980) ("In Kentucky, there is no common law support for the [construction trust fund theory]. However, support for such a claim may derive from a statutory provision ... requiring contractors to pay in full all materialmen from funds they receive from the owner."), *Citizens Fidelity Bank & Trust Co. v. Fenton Rigging Co.*, 522 S.W.2d 862 (Ky.Ct.App.1975). Moreover, the court in *Fenton* emphasized that the owner's obligation to pay the subcontractors effectively removes the money owing to the subcontractors from the general contractor's accounts receivable;[6] since the general contractor has no valid claim to the money, the general contractor's creditors, secured or not, likewise may stake no claim. *Id.* at 863; *see also Aquilino v. United States*, 10 N.Y.2d 271, 219 N.Y.S.2d 254, 262, 176 N.E.2d 826, 832 (1961) ("Our conclusion, then, is that ... a contractor does not have a

sufficient beneficial interest in the moneys, due or to become due from the owner under the contract, to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid.")

The construction trust fund theory and the owner's duty to insure that the subcontractors get paid have been firmly rooted in Georgia not only by state courts but by federal district courts in Georgia as well. *See, e.g., Mullins v. Noland Co.*, 406 F.Supp. 206, 212–14 (N.D.Ga.1975). While it is true that many of the decisions expressing support for the construction trust fund theory pre-date the 1978 amendments to the Georgia UCC, the significance of that fact is not clear. Furthermore, and of central importance to this Erie-court, there is no reported Georgia authority indicating that Georgia law has now changed. Absent an express indication from either the Georgia courts or legislature that the law in Georgia has been altered, it is not our role to jettison the construction trust fund doctrine. *Jackson [v. Johns-Mansville Sale Corp.]*, 781 F.2d [394] at 397. Although the Bank asserts that the priority scheme established in section 9–310 of the Georgia UCC—giving a bank's perfected security interest priority over a materialman's lien—somehow renders the trust fund theory obsolete, the Bank does not explain why this is so. Significantly, the Bank cites no support for this novel proposition, and there is neither legislative history nor Georgia authority amplifying the Bank's view. Just as plausibly, the priority structure established in section 9–310 is intended to govern the situation where the contractor and the bank are battling over the assets of the same account debtor. *See, e.g., Newton Ford Tractor Co. v. J I Case Credit Corp*, 163 Ga.App. 497, 294 S.E.2d 723 (1982).

We conclude that principles of Georgia law, as expressed by various decisions of the Georgia courts, support the viability

of the construction trust fund theory under Georgia law. The notion that this doctrine has been abrogated by the Georgia UCC or its amendments is a novel theory which finds no support in the Georgia law.

[4] The Georgia UCC became effective on January 1, 1964. Section 9–310 of the Georgia UCC, Ga.Code Ann. § 11–9–310, was amended in 1978 to provide that a perfected security interest in collateral takes priority over all liens enumerated in Ga.Code Ann. § 67–1701 (presently codified as Ga.Code Ann. § 44–14–320), which includes materialmen's liens on real property. This amendment is significant in that the Bank maintains that it evinces the Georgia legislature's intention to annul the construction trust fund doctrine, at least insofar as secured creditors are concerned. As we indicate in the text, there is no basis for inferring this intention from the 1978 amendments.

[5] Parenthetically, we note that this provision of Georgia law is embodied in the UPS–Weben contract.

[6] Cf. *Sterling National Bank & Trust Co. v. Southwire Co.*, 713 F.2d 684 (11th Cir.1983) (account receivable under Georgia law is a right to payment); *In re Barnes Freight Line, Inc.*, 29 B.R. 664 (Bankr.N.D.Ga.1983).

While *United Parcel Service* differs factually from the case at bar since in that case the proceeds were placed into the registry of the court and not paid to the materialman by way of the contractor, this court finds that this factual distinction is irrelevant. If a constructive trust is to be imposed upon the amount owing for the work done, paying this money to the contractor would not destroy the trust upon this money any more than would paying it into the registry of the court.[8]

In deciding whether Georgia law would impose a constructive trust upon the funds

**8.** This factual difference is important, however, for another reason. In order for Bethlehem to succeed it must still prove that money held in trust by the contractor can be traced. *See* Discussion *infra*, p. 941.

**9.** *See* former O.C.G.A. § 44–14–361(b) (1982); O.C.G.A. § 44–14–361.2 (1986); and *Dixie Concrete Services, Inc. v. Life Insurance Company of Georgia*, 174 Ga.App. 866, 331 S.E.2d 889 (1985) (all holding that a lien will not attach, or if already attached, will be dissolved by a sworn statement that the materialman has been paid).

owing to the materialman an important consideration, not mentioned in the *United Parcel Service* decision, is what type of protection is afforded a materialman absent the application of such a doctrine. The bankruptcy court held that:

> From a practical standpoint, even when a materialman receives full payment from a contractor, the materialman could be forced to file a claim of a materialman's lien within the ninety-day state statutory time limit or lose the protection of the lien laws in the event of a subsequent bankruptcy filing by the contractor.

*J. Coleman Tidwell, Trustee v. Bethlehem Steel Corporation*, 56 B.R. 509 (M.D.Ga. 1985). This avenue of protection, however, is not available to the materialman once he has been paid in full. Georgia's lien laws provide that a sworn statement from the contractor that the materialman has been paid will prevent a lien from attaching to the property.[9] Furthermore, under present Georgia law, a materialman that files a lien on real property, or fails to cancel this lien after final payment has been made will be liable to the owner for the costs of removing such liens.[10] This inability on the part of materialmen to protect themselves under Georgia's lien laws from a contractor's subsequent bankruptcy, once they have been paid for the materials they supplied, further supports a finding that the constructive trust fund doctrine in Georgia would be available to these materialmen. Accordingly, this court holds that Georgia law recognizes the constructive trust fund doctrine with respect to payments owed mate-

**10.** *See* O.C.G.A. § 44–14–362 (1986) which reads in relevant part:

(a) Upon final payment after all labor, services, or materials have been furnished, a person who has filed a preliminary notice of lien rights shall either deliver a cancellation of the preliminary notice of lien rights at the time of final payment or cause the notice to be canceled of record within ten days after final payment. Any person who fails to so cancel a preliminary notice shall be liable to the owner for all actual damages, costs, and reasonable attorney's fees incurred by the owner in having the preliminary notice canceled.

rialmen by their contractors for improvements made to a third party's realty.

■ This decision is a narrow one, however, and should not be construed to mean that all payments made to a contractor by an owner for work done on its property do not constitute property of the contractor. In order to better explain the court's decision, it might be helpful to detail when such payments would or would not be subject to the constructive trust fund doctrine. Certainly payments that exceed the amount owed to the contractor's materialman would always be property of the contractor as to that excess. The portion of the payments that does not exceed the amount owed to the materialman would be subject to the constructive trust fund doctrine if the payments are made to the contractor during the period of time when the materialman either enjoys the right to file a lien on the owner's property or she already has a valid lien on the owner's property. This protection for the materialman is lost, however, if the materialman is *actually paid* after he loses the right to file a lien on the owner's property. If the materialman wishes to invoke the constructive trust fund doctrine protection after the statutory grace period to file a lien lapses, he must secure a lien on the property before the end of the statutory grace period. This is because the rights and duties created under Georgia law, as discussed in the *United Parcel Service* decision, no longer exist after these lien rights are extinguished. Finally, the constructive trust fund doctrine can be asserted in the situation where an owner has yet to pay its contractor for the materials supplied, the contractor goes bankrupt, and a materialman with either a valid lien on the owner's property or with a right to file a lien on the owner's property exists. Under these circumstances, the owner could deposit the sums it owes into the registry of court, where they would be used to satisfy the materialman's claim that is validly perfected or capable of being perfected at that time. Again, if the materialman does not have a valid lien or is incapable of perfecting a lien at that time, he cannot assert the constructive trust fund doctrine.

The application of the constructive trust fund doctrine in these situations is appropriate given the fact that to allow the trustee to avoid these payments would frustrate the purpose of the Georgia materialmen's lien statute. This statute, like others of its kind, has been held to be for the purpose of,

> [giving] the furnisher of labor and material a claim upon the owner, to compel him at his peril to *withhold final payment* until he has received assurance from the contractor that he has paid all material and labor claim, which are or which may be perfected into liens.

*Mullins*, 406 F.Supp. at 213 (emphasis in original). To not allow payments similar to the ones involved in this case to go to materialmen would compel potential lienors to forego a reasonable commercial practice that is designed to carry out a swift settlement of the respective parties' rights and obligations, in favor of insisting on enforcement of their lien rights, thereby creating an unnecessary and expensive impediment to the prompt settlement of construction contracts. *Mullins*, 406 F.Supp. at 214. Furthermore, a finding that these types of payments are avoidable by a bankruptcy trustee would defeat the reasonable commercial expectations of the materialmen and would also create a wholly fortuitous windfall to the trustee. *Id.* This court, therefore, concludes that the constructive trust fund doctrine is viable in Georgia, but that its availability is limited to those circumstances in which the doctrine is necessary to preserve the statutory framework of the Georgia materialmen's lien laws.

In the case at bar the bankruptcy court made factual findings that led it to conclude that at the time Bethlehem was paid by Georgia Steel for the materials it had supplied, Bethlehem could have filed a materialmen's lien on the Brown & Williamson property. This court finds the bankruptcy court's findings of fact and conclusions of law on Bethlehem's ability to file a lien on the Brown & Williamson property up until

the moment it was paid for the materials to be supported by the record and applicable law. This is because under Georgia law a materialman's lien rights attach following the first delivery of materials to be used on a job and expire ninety (90) days following the date of the last delivery. *See Mullins,* 406 F.Supp. at 211. Assuming the last item is a lienable item, then the subsequently perfected lien would relate back to cover all items delivered, including those items delivered more than ninety days prior to the filing of the lien. *Id.* In this case Bethlehem's last shipment of steel for the Brown & Williamson job occurred on May 17, 1981. Georgia Steel made its last payment to Bethlehem for the steel supplied to the Brown & Williamson site on July 16, 1981, by check, and this check was paid by Georgia Steel's bank on July 22 or 23, 1981, which was well within the ninety day grace period. Furthermore, since Bethlehem demonstrated that it shipped this material to Georgia Steel under invoices designating the steel for the Brown & Williamson job, a presumption arose that the material was actually used to improve the real estate at the Brown & Williamson site. *See Sanford v. Hodges Builders Supply, Inc.,* 166 Ga. App. 86, 87, 303 S.E.2d 280, 282 (1983); and *Horne-Wilson, Inc. v. Smith,* 109 Ga.App. 676, 678, 137 S.E.2d 356, 357–58 (1964). This presumption was not rebutted. Accordingly, the court finds that since Bethlehem's lien rights had not been extinguished prior to its receiving these payments, Bethlehem is entitled to avail itself of the protection afforded by the constructive trust fund doctrine.

With all due deference to the very capable bankruptcy judge, this court must conclude that the bankruptcy court erred in finding that Georgia law would not recognize the constructive trust fund doctrine in Georgia. Because of this error, the bankruptcy court incorrectly found that the payments made by Brown & Williamson to Georgia Steel for materials supplied by Bethlehem were property of the debtor. Since these payments were not property of Georgia Steel, they were not subject to avoidance under section 547(b).[11] There still remains a question, however, of whether these funds held by Georgia Steel in trust for Bethlehem were the funds actually paid to Bethlehem.

While the Bankruptcy Code allows property held in trust by a debtor not to be considered property of that debtor, the beneficiary of the trust is entitled to these trust assets only if the trust assets are traceable.[12] The bankruptcy trustee contends that these trust assets are not traceable to Bethlehem, and, therefore, the payments made to Bethlehem are avoidable. The burden, however, lies on the bankruptcy trustee to establish every element of a preference, including the fact that the money paid to Bethlehem constituted property of the debtor. *See In Re Casco Electric Corp.,* 28 B.R. 191, 195 (Bankr.E.D.N.Y.1983). If the payments made to Bethlehem were made from the trust assets paid to Georgia Steel by Brown & Williamson, their receipt by Bethlehem would not constitute a preference. Since it is undeniable that Georgia Steel received payments constituting trust assets, the burden lay on the bankruptcy trustee to prove that the payments made by Georgia Steel to Bethlehem were not made from these assets.

In the case at bar, resolution of this question is complicated by the fact that Georgia Steel deposited the payments made by Brown & Williamson into its general

---

**11.** Since these payments were not property of the debtor, Bethlehem's argument that section 547(c) would exempt this transaction from section 547(b)'s coverage is not reached.

**12.** Although the Bankruptcy Act does not deal expressly with trusts, the Supreme Court in an early case under the Bankruptcy Act of 1867 established that funds held in trust by a bankrupt debtor are immune from the claims of general creditors so long as the funds can be traced. *Hawkins v. Blake,* 108 U.S. 422, 435–36, 2 S.Ct. 804, 813–14, 27 L.Ed. 775 (1882). This rule has not been changed by the Bankruptcy Act, and the courts have continued to apply it. *See Pearlman v. Reliance Insurance Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962); and *First National Bank v. Staake,* 202 U.S. 141, 26 S.Ct. 580, 50 L.Ed. 967 (1905).

banking account. While commingling of the debtor's assets with the trust assets does not destroy the characterization of these payments as trust funds, it does necessitate the application of the lowest intermediate balance rule to determine whether the trust assets were dissipated prior to the payments made to Bethlehem. Under this rule, when a trustee of a constructive trust commingles trust funds with his own, the beneficiary of the trust may recover to the extent of the lowest balance that the account reached after the commingling. This doctrine rests upon the principle that the trustee is presumed to use his own funds before utilizing the trust funds. In other words, the law presumes that the trustee will do right rather than wrong. *See In Re Mahan & Rowsey, Inc.*, 35 B.R. 898, 903–04 (Bankr.W.D.Okla.1983). The bankruptcy trustee contends that the balance of Georgia Steel's bank account reached, at various times, a level at which the trust assets were substantially, if not totally, dissipated. Because of this fact, the bankruptcy trustee contends that Bethlehem cannot trace the funds held by Georgia Steel to Bethlehem, and, accordingly, the payments made by Georgia Steel to Bethlehem are avoidable as preferences.

■ The bankruptcy trustee overlooks the fact, however, that Georgia Steel replenished this bank account with other funds which, in turn, enabled it to pay Bethlehem for the materials supplied. When a trustee replenishes a commingled account which has fallen below the amount held in trust due to the trustee's invasion, the trustee is presumed to return the beneficiary's money first for the same reasons that we presume that the trustee would use his own money first when withdrawing from the account. *See In Re Mahan & Rowsey, Inc.*, 35 B.R. at 903–04; and *Banks v. Bradwell*, 140 Ga. 640, 646–47, 79 S.E. 572 (1913). Bethlehem, therefore, has demonstrated that the payments it received from Georgia Steel were paid from the trust assets being held by Georgia Steel at the time.[13]

■ Accordingly, for the reasons outlined above this court concludes that Bethlehem is entitled to the entire $89,163.62 paid to it by Georgia Steel. These payments constituted trust assets created by the constructive trust fund doctrine of which Bethlehem was the *cestui que trust.* Furthermore, these trust assets were traceable to Bethlehem because Georgia Steel had replenished the bank account out of which the trust assets had been withdrawn. The decision of the bankruptcy court is, therefore, REVERSED.

---

**13.** There is no claim in this case that Georgia Steel preferred or unfairly advanced payments to Bethlehem while not paying other materialmen that had similar claims for work or materials they had supplied to Brown & Williamson. This court, therefore, leaves open the question of what power the bankruptcy trustee has to recover payments made to favored materialmen or subcontractors when the constructive trust fund assets have been exhausted and some materialmen or subcontractors have been left unpaid.