**GMRI, INC., Plaintiff**

v.

**INDEPENDENCE BANK OF GEORGIA, Defendant**

**CIVIL ACTION NO. 1:14-CV-2999-ODE**

United States District Court, N.D. Georgia, Atlanta Division.

Signed 09/29/2016

---

Brett A. Marlowe, Brian W. Bennett, Page Eichenblatt & Bennett, P.A., Orlando, FL, Henry Milton Quillian, III, Mark B. Carter, Taylor English Duma LLP, Atlanta, GA, for Plaintiff.

John Patrick O'Brien, Jeremy Brent Ross, Thompson O'Brien Kemp & Nasuti, Norcross, GA, for Defendant.

### ORDER

ORINDA D. EVANS, UNITED STATES DISTRICT JUDGE

This civil suit is before the Court on Defendant's Motion for Summary Judgment [Doc. 57]. For the following reasons, the motion is GRANTED.

## I. Undisputed Facts

The following facts are undisputed unless stated otherwise. GMRI is a Florida corporation which is a subsidiary of Darden Restaurants. Defendant is a Georgia community bank founded in 2008 ("Independence Bank" or "the Bank"). Non-party Benchmark Building Contractors ("Benchmark") is a Georgia corporation. Benchmark built many restaurants for Darden/GMRI "over the years" with estimates ranging from 20-50 projects, includ-

ing Olive Garden, Red Lobster and Long-Horn restaurants [Jones Dep., Doc. 74 at 46; Sellers Dep., Doc. 61 at 15, 17]. Benchmark was a Bank customer. Another relevant non-party is Calvin Jones, long-time President of Benchmark and one of the nine or ten founders, shareholders, and directors of the Bank. He served on the Bank's Audit Committee and its Building Committee. There is no evidence in the record that Jones ever was an executive or employee of the Bank, and GMRI makes no claim that he was.

Benchmark had numerous general deposit accounts[1] at the Bank. The deposit agreements stated:

> You each agree that we may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt owed to us now or in the future, by any of you having the right of withdrawal, to the extent of such persons' or legal entity's right to withdraw. If the debt arises from a note, "any due and payable debt" includes the total amount of which we are entitled to demand payment under the terms of the note at the time we set off, including any balance the due date for which we properly accelerate under the note .... We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account.

[Ex. L to Chandler Aff., Doc. 57-4 at 38].

On December 16, 2010, Benchmark executed two Notes: one for a $600,000.00 line of credit,[2] to be paid in full by December 16, 2011, and one for $250,000.00, to be paid in full by November 20, 2013. Both of these Notes were renewals; the line of credit was obtained originally in December 2008 and the $250,000 loan was a renewal

---

**1.** The general deposit accounts also were checking accounts.

**2.** The line of credit was fully disbursed [Doc. 57-4 Ex. F].

of an earlier loan made at an unspecified time. Calvin Jones guaranteed the payment of both loans. Under the terms of the Notes, default occurred if Benchmark was insolvent, if it experienced an adverse change, or if the Bank deemed itself to be insecure. The definition of "adverse change" included a material adverse change in Benchmark's financial condition, or if the Bank believed the prospect of payment or performance on the Note was impaired. "Insecurity" was defined as "Lender in good faith believes itself insecure." The Bank reserved the right to set off Benchmark's accounts in the event of default.

Contemporaneously with signing the Notes, Benchmark executed security agreements which pledged to the Bank as collateral:

> All Chattel Paper, Accounts and General Intangibles; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance general intangibles and other accounts proceeds).

[Exs. C & D to Chandler Aff., Doc. 57-4 at 16-20, 21-25]. The Bank perfected its security interest through a UCC financing statement which was filed in Gwinnett County, Georgia on December 11, 2008, covering all chattel paper, accounts, and general intangibles owned "now or acquired later" [by Benchmark] [Ex. E to Chandler Aff., Doc. 57-4 at 26].

In June and July 2011, GMRI entered into two contracts with Benchmark: one to construct an Olive Garden Restaurant in Owings Mills, Maryland ("the Owings Mills project") for $1,453,059.00; and another to construct an Olive Garden Restaurant in Henrico, Virginia ("the Henrico project") for $1,199,679.00 [Doc. 57-2 at 39-126, 127-205]. Both were standard form AIA contracts. Neither contract required Benchmark to obtain a surety bond to guarantee payment of subcontractors.[3] No surety bond was obtained for these projects. Both contracts stated that GMRI had the right "at its sole option" to make checks jointly payable to Benchmark and a subcontractor or to withhold payment from Benchmark when Benchmark did not properly pay subcontractors [Doc. 57-2 at 43, 105, 131, 184].

Both the Henrico and the Owings Mills contracts between GMRI and Benchmark provided: "Any and all funds payable to Contractor hereunder are to be applied first to the claims of its subcontractors, sub-subcontractors, suppliers, architects, engineers, surveyors, equipment lessors, laborers and materialmen arising out of the Work ... before application to any other purpose" [Id. at 105, 184].

On September 14, 2011, the Bank's Chief Credit Officer Sidney Chandler recommended a rating change for Benchmark's loans, from "4" to "5—watch list" [see Chandler Dep. II, Doc. 69 at 6-7; Pl.'s Ex. 17, Doc. 87 at 4; Evans Dep. II, Doc. 72 at 72-75]. The reason provided for the change was "Customer has experienced cash flow difficulties related to commercial construction industry. Customer has also received $400,000 in mezzanine financing[4] within past 12 months. All payments on all loans have been made on time" [Pl.'s Ex. 17, Doc. 87 at 4]. At that time, the Bank

---

**3.** "Subcontractors" as used here includes materialmen.

**4.** Bank President Terry Evans explained, "Mezzanine, in my terms, means maybe he got money from a second source, from another company or another individual" [Evans Dep. II, Doc. 72 at 75].

was aware of cash flow problems related to the industry [Chandler Dep. II, Doc. 69 at 7-8].

On October 12, 2011,[5] GMRI was told that Benchmark had not timely paid a subcontractor.

On November 21, 2011, Benchmark submitted requests for payment to GMRI: $312,005.78 for work done on the Henrico project and $513,816.76 for work done on the Owings Mills project. On December 1, 2011, GMRI learned that Benchmark had not timely paid two additional subcontractors. GMRI's/Darden's representative Briggs Sellers contacted Calvin Jones on that day. Jones explained Benchmark was in a "cash-flow pinch" [Sellers Dep., Doc. 61 at 55]. Sellers agreed to accelerate payment of the November 21, 2011 draw request on Jones' assurance that this would enable him to bring all the subcontractors' payments up to date [Sellers Dep., Doc. 61 at 55; Jones Dep., Doc. 74 at 82-84].

On or about December 6, 2011 GMRI made an electronic deposit of $312,005.78 to Benchmark's account at the Bank; an electronic deposit of $513,816.76 was made on December 8, 2011. GMRI's only instruction was "GMRI Accts pay." Shortly after the deposits were made GMRI learned that Benchmark's checks to subcontractors were bouncing. Briggs Sellers called Jones who told him he could not pay his subcontractors. Sellers said "So essentially you're basically defaulting on these contracts and I need to take over the work" [Sellers Dep., Doc. 61 at 56]. Sellers stated that Jones agreed with this [Id.]. There is no testimony to the contrary.

As of December 2011 Benchmark had numerous accounts with the Bank. All were standard deposit/checking accounts. None were trust accounts. Independence Bank does not handle trust accounts. GMRI's claims appear to be focused on the activity in account 7643358287 ("287 account"). On the first of December 2011 the 287 account had a beginning balance of $45,372.51. Total additions to the account for that month were $1,499,245; total debits were $1,544,617.51, with an ending balance of zero. This does not take into account $113,301.16 of checks payable to Benchmark's subcontractors on the Henrico project which were not debited from the account but rather returned pursuant to Jones' instructions in a December 12 letter, described below or other checks which bounced due to lack of funds. The credits to the account included transfers from Benchmark's other deposit accounts at the Bank, GMRI's deposits of $312,005.78 on December 6 and $513,816.76 on December 8, and various other deposits. The last deposit occurred on December 12, 2011 [Pl.'s Ex. 94, Doc. 91 at 143]. Debits to the account included periodic payments to the Bank on Benchmark's loans, transfers to other Benchmark deposit accounts with the Bank, a wire transfer payment of $238,624.22 to Chase Bank to pay off Chase's loan to Benchmark, and fees for checks returned for insufficient funds. The account was closed on December 13, 2011 with a zero balance [Pl.'s Ex. 62, Doc. 86 at 37; Pl.'s Ex. 23, Doc. 87 at 12].

Checks totaling $89,688.30 to subcontractors who worked on the Owings Mills project were drawn on account 7643353560, another deposit account. These checks were not paid when they were presented. This account was also

---

**5.** GMRI objects to the admissibility of a subcontractor's letter based on hearsay and relevance [Pl.'s Resp. SMF, Doc. 64-1 ¶ 23]. First, the letter is admissible for the non-hearsay purpose of demonstrating that GMRI had notice of Benchmark's alleged failure to pay its subcontractors. Second, whether GMRI had notice is relevant to its subsequent actions in depositing money into Benchmark's general business account, and whether that deposit was made with knowledge of Benchmark's failure to pay its subcontractors.

closed on December 13, 2011 with a zero balance [Pl.'s Ex. 62, Doc. 86 at 37; Pl.'s Ex. 64, Doc. 86 at 39].

On Friday, December 9, Benchmark's President, Calvin Jones, apparently sent an unsigned letter addressed to the Bank's President which said in its entirety: "Dear Terry, Until further notice do not pay any checks or pre authorized debits without my express approval. Please freeze the above referenced accounts[6] until further notice" [Ex. J to Chandler Aff., Doc. 57-4 at 35]. It is undisputed that on Monday, December 12 at 10:22 A.M. Bank Vice President Aimee Souto emailed Jones: "Calvin please sign the attached letters and email back ASAP so that the items can be returned" [Pl.'s Ex. 6, Doc. 86 at 34]. It is undisputed that the two letters attached to Souto's December 12 10:22 A.M. email were a copy of the unsigned letter dated Friday, December 9, and a letter dated December 12 which instructed the Bank to "return the following checks" [Id. at 35-36]. The letter dated December 12 listed fourteen checks by check number, amount and name of payee [Id. at 36]. Some of the checks were for work on the Henrico project and some were for work on the Owings Mills project.

At 10:31 A.M. Jones emailed Souto: "Attached is the signed letter ... I'll bring you the original ... CJ" [Pl.'s Ex. 60, Doc. 86 at 30]. At 10:32 A.M. Souto emailed Jones: "Can you sign the second one also" [Id.]. At 10:36 A.M. Jones emailed back: "Here is the second letter ... Thanks for your help ... CJ" [Id.].

At around noon on Monday, December 12, Calvin Jones met with Terry Evans and Sidney Chandler.

Regarding the manner in which the December 12 meeting unfolded, Jones testified in his deposition that he went to the meeting hoping that the Bank would re-new Benchmark's loans, but knowing that Benchmark's small amount of work in progress made that unlikely [Jones Dep., Doc. 74 at 48]. He testified that after some discussion he understood the Bank was not going to renew the loan and "at that point the bank decided to take what money I did have and apply it to my loan to pay it off" [Id. at 49-50].

Evans' and Chandler's deposition testimony focus on a comment made by Jones during the meeting that Benchmark was going out of business. They testified this alone was a good reason to declare a default [Evans Dep. II, Doc. 72 at 78; Chandler Dep. II, Doc. 69 at 73]. GMRI argues that Benchmark might not have decided to go out of business if the Bank had not announced an intention to seize Benchmark's money. However, Evans and Chandler also testified that Jones had said during the meeting he wanted for the Bank "to pay off the note ... pay off the loan, and to take the money" [Evans Dep. II, Doc. 72 at 79; see Chandler Dep. II, Doc. 69 at 61]. This is consistent with Jones' statement. Also, it is undisputed that Benchmark was in financial distress at the time of the meeting as shown by Benchmark's decision not to pay outstanding checks, Jones' conversation with Briggs Sellers, and the fact that Benchmark's loans were on a "watch list." Therefore, it makes no difference whether Jones' reference to going out of business came early or late in the meeting. Evans testified that when Jones said he was closing the business "the loan was in default" [Evans Dep. II, Doc. 72 at 78].

On Monday, December 12 and Tuesday, December 13, 2011 the Bank exercised its right to set off and foreclose on all of the funds in Benchmark's accounts. The Bank's loans to Benchmark were satisfied in full [Chandler Dep. II, Doc. 69 at 75].

6. The "above referenced accounts" were the 287 account and account 7643353560.

Benchmark did close its business and let its employees go later that week.

On December 21, 2011 GMRI's counsel wrote to the Bank demanding return of the two deposits GMRI had made to Benchmark's account. Counsel for the Bank responded on December 30, refusing to return the funds.

In 2012 GMRI, project owner, made settlements with approximately 40 of Benchmark's subcontractors on the Henrico and the Owings Mills projects to obtain the release of their liens [see Pl.'s Exs. 11-51, Docs. 61-4-61-67]. The settlements included partial payments by GMRI to the subcontractors and the subcontractors' assignment of their claims against Benchmark and the Bank to GMRI [Id.]. The subcontractors executed waivers and dismissed their lien claims.

GMRI sued Benchmark and Jones on February 11, 2013 in the Superior Court of Gwinnett County on account of their failure to pay the subcontractors on the two projects out of the funds GMRI had deposited to Benchmark's account at the Bank. On July 10, 2014, GMRI obtained a consent judgment against Benchmark in the amount of $1,020,757.34 principal, plus interest and attorneys' fees and a consent judgment against Calvin Jones in the amount of $733,063.62 principal, plus interest and attorneys' fees.

On September 18, 2014, GMRI filed the instant complaint against the Bank, seeking damages "in excess of $75,000" for breach of trust, conversion of the deposits GMRI made to Benchmark's account, and money had and received.

On November 2, 2015, the Bank filed its Motion for Summary Judgment [Doc. 57]. GMRI responded on November 23, 2015 [Doc. 64], and shortly thereafter the Bank replied [Doc. 95]. The motion is now ripe for review.

## II. Summary Judgment Legal Standard

The Court will grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted). "[T]he substantive law will identify which facts are material." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Only after the moving party meets this initial burden does any obligation on the part of the nonmoving party arise. Chanel, Inc. v. Italian Activewear of Fla., Inc., 931 F.2d 1472, 1477 (11th Cir. 1991). At that time, the nonmoving party must present "significant, probative evidence demonstrating the existence of a triable issue of fact." Id. If the nonmoving party fails to do so, the moving party is entitled to summary judgment. United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991).

All evidence and justifiable factual inferences should be viewed in the light most favorable to the nonmoving party. Rollins v. TechSouth, Inc., 833 F.2d 1525, 1532 (11th Cir. 1987); Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987). Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. Anderson, 477 U.S. at 255, 106 S.Ct. 2505. However, the mere existence of some alleged factual dispute

between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. Id.

## III. Discussion

Plaintiff GMRI brings suit for damages against Defendant Independence Bank based on three causes of action: (1) conversion, (2) breach of fiduciary duty, and (3) money had and received. As to all three causes of action, GMRI brings the claims in its own right and also as assignee of claims of subcontractors on the Henrico and Owings Mills projects.

 GMRI's claims brought in its own right fail as a matter of law. These claims are precluded by the Georgia Supreme Court's ruling in Vinings Bank v. Brasfield & Gorrie, LLC, 297 Ga. 468, 470, 774 S.E.2d 701 (Ga. 2015) ("Vinings Bank II").[7] In Vinings Bank II, the Georgia Supreme Court held that Brasfield & Gorrie, a general contractor, had no standing to bring a claim for conversion against the bank when the contractor had no direct relationship with the bank and was not itself a subcontractor of the bank's account holder.[8] Here, GMRI had no direct relationship with Independence Bank and was not a subcontractor of the account holder (Benchmark). Also, GMRI's claim for breach of fiduciary duty against Independence Bank fails because Independence Bank had no fiduciary responsibility to GMRI, with whom the Bank had no contractual or other relationship. GMRI's cause of action for money had and received fails. Independence Bank received wired

funds sent by GMRI but GMRI expressly directed Independence Bank to deposit the funds to Benchmark's account, which the Bank did. These facts negate GMRI's claim for money had and received. Taylor v. Powertel, Inc., 250 Ga.App. 356, 359, 551 S.E.2d 765 (Ga. Ct. App. 2001) (listing elements for money had and received including that defendant received money that he should not keep in equity and good conscience). In summary, all of these claims fail based on lack of standing or substantive law.

Analysis of the subcontractors' claims which they assigned to GMRI is more complex. For the reasons set forth below, the Court concludes that these claims fail because (1) this Court cannot impose a constructive trust because Benchmark no longer has the funds and has not possessed the funds since December 2011; there is no traceable, identifiable pool of funds on which to impose a constructive trust; (2) this case is governed by state law and state law precedent does not provide for imposition of a constructive trust on the facts presented; (3) the Bank had a perfected security interest in Benchmark's accounts receivable which took priority over the subcontractors' claims; and (4) under the contract documents the Bank was entitled to declare Benchmark's loans in default and set off and foreclose on the funds in Benchmark's account.

 " '[A] constructive trust is a remedy created by a court in equity to prevent unjust enrichment. Such a trust is impressed upon property when it is against equity that the person holding title to the

---

7. Several opinions in the Vinings Bank case are referenced in this Order. The Georgia Court of Appeals' opinion in Vinings Bank v. Brasfield & Gorrie, LLC, 328 Ga. App. 636, 759 S.E.2d 886 (Ga. Ct. App. 2014) ("Vinings Bank I") was vacated in part by the Georgia Supreme Court's opinion in Vinings Bank v. Brasfield & Gorrie, LLC, 297 Ga. 468, 774

S.E.2d 701 (Ga. 2015) ("Vinings Bank II"), as stated in Vinings Bank v. Brasfield & Gorrie, LLC, 335 Ga.App. 538, 782 S.E.2d 322 (Ga. Ct. App. 2016) ("Vinings III").

8. The bank's account holder was WEI, a subcontractor.

property be allowed to enjoy the beneficial interest in the property.'" Vinings Bank I, 328 Ga.App. at 641, 759 S.E.2d 886 (quoting St. Paul Mercury Ins. Co. v. Meeks, 270 Ga. 136, 137, 508 S.E.2d 646 (Ga. 1998)). "Constructive trust is a remedy, not a cause of action." Restatement (Third) of Restitution & Unjust Enrichment § 55, Comment, f (Am. Law. Inst. 2011). "Constructive trust is a flexible device—originating in equity, but in widespread current usage—by which a court directs that property to which B holds legal title be transferred to A." Id. Comment b. "Constructive trust permits the claimant to assert ownership of (i) specifically identifiable property for which the defendant is liable in restitution or (ii) its traceable product .... Id. Comment g.

■ In addition, when the property in question is money as in this case, it must comprise an identifiable fund to support an action for conversion. See Levenson v. Word, 294 Ga.App. 104, 106 n.5, 668 S.E.2d 763 (Ga. Ct. App. 2008) (explaining that claim of conversion of money cannot be sustained without a showing that the money converted comprises a specific and identifiable fund).

■ GMRI's primary argument in support of the subcontractors' claims is that Benchmark held the $825,822.54 ($312,-005.78 plus $513,816.76) as constructive trustee for the subcontractors. It does not address what res is available for this purpose, or how the res could be traced from the deposits in Benchmark's account. This is fatal to the conversion claim. GMRI argues that the Bank could not lawfully seize the money and set it off against Benchmark's debt on the loans, despite the Bank's perfected security interest. GMRI

cites Bethlehem Steel Corp. v. Tidwell, 66 B.R. 932 (M.D. Ga. 1986), and Vinings Bank v. Brasfield & Gorrie, LLC, 328 Ga. App. 636, 759 S.E.2d 886 (Ga. Ct. App. 2014), ("Vinings I"), vacated in part by 297 Ga. 468, 774 S.E.2d 701 (Ga. 2015) ("Vinings II"), in support of these propositions. These cases are materially dissimilar to the instant case. Also, Bethlehem Steel is not controlling precedent.

In Bethlehem Steel, the issue before the district court was whether a contractor's bankruptcy trustee could recover as a preference a payment made to a subcontractor just prior to the contractor's bankruptcy filing. The court held that the bankruptcy trustee could not recover the funds, relying on previous federal bankruptcy cases.[9] Under these decisions, no preference can occur when a contractor pays a subcontractor within 90 days of the contractor's bankruptcy filing. The stated justification is that when the contractor holds funds paid by the project owner and the subcontractors have not been paid, the contractor has no interest in the proceeds. Bethlehem Steel similarly reasoned that payment to the subcontractor did not constitute a preference because the bankrupt contractor had never owned the funds in the first place. But unlike this case, Bethlehem Steel is a bankruptcy case under federal bankruptcy law.[10]

In addition, this Court disagrees with Bethlehem Steel's implicit determination that pre-Bethlehem Steel Georgia law supported the concept that a contractor has no interest in funds paid by the project owner to the extent that subcontractors remain unpaid. Bethlehem Steel correctly pointed out that many prior Georgia cases emphasized the importance of making sure

9. The initial ruling applying this concept is Cutler–Hammer, Inc. v. Wayne, 101 F.2d 823 (5th Cir.), cert. denied, 307 U.S. 635, 59 S.Ct. 1031, 83 L.Ed. 1517 (1939).

10. Because the instant case is not a bankruptcy case, this Court will not re-examine the validity of the Cutler–Hammer line of cases.

the subcontractors are paid, and the duty of the project owner to take steps to ensure payment, but these decisions do not reach far enough to establish that a contractor paid by the project owner has no interest in the funds to the extent that subcontractors have not been paid. Similarly, this Court respectfully disagrees with Bethlehem Steel's observation that enforcing the priority scheme of Article 9 of the Uniform Commercial Code in the face of a constructive trust claim would be a "novel proposition." To this Court, failing to recognize the validity and priority of a perfected security interest seems the more novel approach. Finally, the concept that an inchoate constructive trust could cause a bank's processing of bank deposits and collections under Article 4 of the UCC to constitute a conversion is quite troubling, as it flies in the face of the efficiency and reliability of commercial transactions which the UCC was intended to foster.

As the Georgia Court of Appeals observed (concerning the Bethlehem Steel decision) in Doyle Dickerson Co. v. Durden, 218 Ga.App. 426, 427, 461 S.E.2d 902 (Ga. Ct. App. 1995) (a case involving a subcontractor's conversion claim against a contractor), "[W]e are in an unusual posture in that the primary authority which directly addresses the issues at hand is not binding precedent, but instead reflects the best guess of the federal courts anticipating how the Georgia appellate courts would rule."

Vinings Bank, also relied upon by GMRI, is a state law case, but it does not dictate that a constructive trust must be imposed on Benchmark's receivables, even aside from the issue of lack of a res on which to impose it. Also, Vinings Bank does not address the question whether a constructive trust, if imposed, would defeat the express provision of Georgia Code Ann. § 11–9–333 that a perfected security interest like the Bank's takes priority over the claims of materialmen.

Finally, Vinings Bank's facts are materially different from those of the instant case. In this case, Independence Bank was a secured creditor of the general contractor Benchmark and held a perfected security interest in Benchmark's receivables. Vinings Bank, on the other hand, had no relationship with contractor Brasfield & Gorrie; Vinings Bank's customer was WEI, a subcontractor which had pledged its receivables to Vinings Bank. Vinings Bank sued Brasfield & Gorrie, asking the Court to order that funds held by Brasfield & Gorrie (some or all of which might or might not be owed to WEI), be turned over to Vinings Bank. The Georgia Court of Appeals found that the extent of WEI's interest in funds held by Brasfield & Gorrie (and hence the extent of Vinings Bank's interest) could not be determined as a matter of law, and it sustained the trial court's ruling denying Vinings Bank's motion for summary judgment due to unresolved factual issues affecting determination of how much money Brasfield & Gorrie owed WEI for its work. This would determine the dollar amount of WEI's existing receivables to which Vinings Bank's security interest could attach. Though the Georgia Court of Appeals did recognize the availability of a constructive trust remedy in Georgia, it did not determine that Vinings Bank's perfected security interest in WEI's receivables should be subordinated to the interest of any other entity.

Independence Bank had a perfected, first priority security interest in Benchmark's receivables. Georgia law controls on this issue. Ga. Code Ann. § 11–9–301 (stating, in part, that "[w]hile a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collat-

eral"). Benchmark's location was in Georgia. See Ga. Code Ann. § 11–9–301. Also, the security agreements specify that Georgia law controls.

As of June-July 2011, the Bank had a perfected security interest in Benchmark's current and future accounts receivable. The security agreements signed by Benchmark in 2010 were enforceable against Benchmark because "value" had been given (the Bank had loaned money to Benchmark); the debtor (Benchmark) "had rights in the collateral" (Benchmark had granted a security interest in its future accounts receivable to 2008 and had signed contracts with GMRI for the Henrico and Owings Mills projects in June and July 2011). See Ga. Code Ann. § 11–9–203 (a), (b). The Bank's security interest in Benchmark's future accounts receivable was perfected through the filing of its financing statement in 2008. Ga. Code Ann. § 11–9–310. Pursuant to Georgia Code Ann. § 11–9–502(d), "A financing statement may be filed before a security agreement is made or a security interest otherwise attaches."[11] Also, the effectiveness of the 2008 financing statement had not lapsed as of December 2011. See Ga. Code Ann. § 11–9–515 (filed financing statement effective for five years).

Pursuant to Georgia Code Ann. § 11–9–333, the Bank's perfected security interest in Benchmark's accounts receivable took priority over subcontractors' liens de-

scribed in Georgia Code Ann. § 44–14–320, "as now or hereafter amended," Ga. Code Ann. § 11–9–333, enacted by Ga. L. 2001, p. 362; § 1, Ga. L. 2011, p. 752, § 11/HB 142.

Under the terms of the Notes, the Bank was entitled to declare Benchmark's loans in default when it properly deemed itself insecure; under the terms of deposit agreements between the Bank and Benchmark, the Bank was entitled to set off the money in Benchmark's accounts against Benchmark's debt on the loans. Under the terms of the security agreements between the Bank and Benchmark, the Bank was entitled to foreclose on the collateral (the proceeds of Benchmark's accounts receivable from GMRI) and apply the proceeds to Benchmark's loan balances. Because the Bank's actions were authorized by the contractual documents,[12] there was no unlawful possession which is the hallmark of conversion.[13] The Bank is entitled to summary judgment on this claim.

GMRI's breach of trust claim against the Bank (brought on behalf of the subcontractors) fails because Independence Bank had no fiduciary relationship with the subcontractors.

The Bank argues that the subcontractors' breach of trust claim asserted by GMRI is barred for the reasons previously discussed and by the applicable statute of limitations, which is shortened to two rath-

---

**11.** Pursuant to Georgia Code Ann. § 11–9–314(a), a bank's security interest in funds in a deposit account may also be perfected through possession. In this case the Bank possessed the proceeds of Benchmark's accounts receivables.

**12.** In another case arising out of Independence Bank's setoff of Benchmark's accounts, Judge O'Kelley found that the Bank was entitled to summary judgment on a conversion claim brought by Benchmark's surety company because the Bank held a prior perfected security interest. See Old Republic Surety Co.

v. Independence Bank of Ga., 1:12-CV-01650-WCO (N.D. Ga. Sept. 3, 2014).

**13.** "Default" under the Notes was defined broadly, to include instances where Benchmark experienced an "adverse change," such that the Bank believed the prospect of performance was impaired, or when the Bank in good faith deemed itself insecure. Accordingly, the Court finds no genuine dispute as to whether Benchmark was in default under the Notes when set off occurred on December 13, 2011.

er than six years because GMRI received written notice of its claims in December 2011. Because the Court declines to impose a constructive trust, and Independence Bank was not a fiduciary in relation to GMRI's subcontractors there is no actionable breach of trust claim against the Bank. Thus, summary judgment is also appropriate on this claim.

The elements for a money had and received claim are that (1) a person has received money of the other that he should not be allowed to keep in equity and good conscience, (2) a demand for repayment, and (3) refusal of that demand. Taylor, 250 Ga.App. at 359, 551 S.E.2d 765. For the reasons discussed above, the Bank was contractually entitled to set off Benchmark's outstanding debt against the funds in Benchmark's deposit accounts. Thus, GMRI cannot establish the first element of its action for money had and received. Accordingly, the Bank's Motion for Summary Judgment is GRANTED as to GMRI's claim on behalf of the subcontractors for money had and received.

## IV. Conclusion

In sum, the Bank's Motion for Summary Judgment [Doc. 57] is GRANTED. The Clerk is DIRECTED to enter judgment in Independence Bank's favor.

SO ORDERED, this 29 day of September, 2016.