In re WENDY'S FOOD SYSTEMS, INC., Debtor.

WENDY'S FOOD SYSTEMS, INC., Plaintiff,

v.

The STATE OF OHIO C/O DEPARTMENT OF TAXATION, Defendant.

Bankruptcy No. 2–87–03759.
Adv. No. 2–89–0169.

United States Bankruptcy Court,
S.D. Ohio, E.D.

Sept. 18, 1991.

**918**

Todd R. Marti, Schottenstein, Zox & Dunn, Columbus, Ohio, for plaintiff.

Dave Lambert, Ohio Atty. General's Office, Taxation Section, Columbus, Ohio, for defendant.

Nick V. Cavalieri, Arter & Hadden, Columbus, Ohio, for the Official Unsecured Creditors' Committee.

## OPINION AND ORDER OF COMPLAINT TO AVOID A PREFERENCE

BARBARA J. SELLERS, Bankruptcy Judge.

### I. *Procedural Background*

This matter is before the Court on a complaint filed by debtor Wendy's Food Systems, Inc. ("WFS") seeking to recover from The State of Ohio ("Ohio") certain payments alleged to be preferential transfers. The parties agreed to submit the dispute for decision upon stipulated facts, exhibits and legal memoranda. Certain additional factual statements contained in Ohio's Memorandum of Law have been struck by separate order of the Court.

The Court has jurisdiction in this adversary proceeding under 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding which this bankruptcy judge may hear and determine under 28 U.S.C. § 157(b)(2)(F).

### II. *Facts*

The parties stipulated the essential facts as follows:

1. WFS filed a Chapter 11 bankruptcy case in this Court on August 25, 1987, such case being captioned as *In re Wendy's Food Systems, Inc.*, Case Number 2–86–03759, (Bankr.S.D.Ohio 1987). WFS has been and continues to be a debtor-in-possession in that case.

2. Prior to filing bankruptcy WFS operated approximately fifty-five fast food restaurants in Ohio and twenty-five fast food restaurants in the state of New York.

3. At all times relevant to this adversary proceeding, WFS was the holder of a master vendor's license and some fifty-five individual vendors' licenses for each of its retail food restaurants. Pursuant to Ohio Revised Code Section 5739.03, WFS was responsible for charging and collecting Ohio sales taxes on all food sold and consumed on the premises of its Ohio restaurants, and on all beverages sold by it.

4. At all times relevant to this adversary proceeding, Ohio imposed a sales tax on all taxable purchases at rates of either five, five-and-one-half, or six percent, depending upon the locations of the retail outlets. WFS collected the applicable tax from consumers on all taxable sales made by it.

5. Records of sales taxes charged and collected from customers were maintained at each restaurant by cash register tapes. At the close of each day, the restaurant manager would ring out the cash registers, and calculate and record the applicable sales taxes collected in the restaurant's daily cash sheet. The daily cash sheet would be forwarded to WFS' headquarters in Columbus, Ohio.

6. In the normal course of its business WFS maintained a separate depository bank account for each of its restaurants. Employees of each restaurant made deposits of each store's receipts one or more times a day. The accounts contained both funds generated by the sale of food products and sales taxes collected pursuant to Chapter 5739 of the Ohio Revised Code, without any segregation of tax funds.

7. The funds in the accounts described in the paragraph (6) above were periodically funneled into one or more of five accounts maintained by WFS with the Huntington National Bank ("HNB"). None of the five HNB accounts was devoted exclu-

sively to the collection or segregation of taxes. Each of the five HNB accounts contained funds attributable to both general operating funds and funds originally collected as taxes. On May 19, 1987 those accounts had an aggregate negative balance. On May 27, 1987 those accounts had an aggregate balance of $212,435.90. WFS collected a total of $64,256.59 in sales taxes pursuant to Chapter 5739 of the Ohio Revised Code between May 1, 1987 and May 31, 1987, inclusive.

8. Immediately prior to the commencement of the ninety day period preceding WFS' filing for bankruptcy on August 25, 1987, WFS was indebted to the state for unremitted sales taxes in the approximate amount of $1,166,116.80. Payment of that amount was then due pursuant to Chapter 5739 of the Ohio Revised Code.

9. During the 90 days immediately preceding the filing of WFS' bankruptcy, WFS made payments totaling $475,000.00 to Ohio on account of Ohio sales taxes. Of that amount $249,492.07 was paid on account of current sales tax obligations on or before the time payment was required pursuant to § 5739.12 of the Ohio Revised Code. The balance of those payments was applied to reduce WFS' debt to Ohio, as described in paragraph (8) above. A significant portion of that debt remained unpaid after the last of those payments had been paid.

10. All of the payments described in paragraph (9) above were made with cashier's checks issued by The Huntington National Bank, which were purchased by WFS with checks drawn from one or more of the five HNB accounts described in paragraph (7) above. All of the checks issued by WFS to purchase those cashier's checks were honored during the 90 days immediately preceding WFS' bankruptcy. All of those cashier's checks were delivered to Ohio during the 90 days immediately preceding the WFS bankruptcy.

11. None of the payments described in paragraph (9) above were designated or earmarked by WFS in any way as being intended to satisfy any specific tax liability.

12. WFS was insolvent, within the meaning of 11 U.S.C. § 101(31)(A) and § 547(b)(3), when the payments described in paragraph (9) above were made.

13. The payments described in paragraph (9) above allowed Ohio to receive more that it would have received if WFS were liquidated under Chapter 7 of the Bankruptcy Code and those payments had not been received.

14. Ohio has filed proofs of claim against the estate in the Chapter 11 bankruptcy case of WFS.

### III. *Issue Presented*

The issue before the Court for decision is whether the funds transferred to Ohio by WFS within 90 days of WFS' bankruptcy petition were property of WFS at the time of such transfers.

### IV. *Discussion*

The parties agree that the narrow issue before the court is whether the payments made to Ohio were made from WFS' property. If so, as WFS contends, then under 11 U.S.C. § 547(b), preferential transfers occurred which WFS may avoid. However, Ohio contends that WFS collected the sales taxes on behalf of Ohio and held such funds in trust for Ohio. Ohio relies upon the recent decision by the Supreme Court of the United States in *Begier v. Internal Revenue Service*, 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). WFS contends that the facts in this matter make it distinguishable from *Begier*.

#### A. The *Begier* Decision

In *Begier*, a Chapter 7 trustee sought to avoid a debtor's alleged preferential transfer to the Internal Revenue Service ("IRS") during the 90 days immediately prior to the bankruptcy filing. The payments transferred were in payment of federal withholding taxes, Federal Insurance Contributions Act taxes ("FICA") withheld from employees' pay, and excise taxes collected from the debtor's customers. As in this proceeding, the only issue before the *Begier* court was whether the payments constituted property of the debtor.

The *Begier* court began its analysis by recognizing the Bankruptcy Code's central

policy of equal distribution of a debtor's property among creditors pursuant to a statutory priority scheme. *Begier,* 110 S.Ct. at 2262–63. Section 547(b) of Title 11, United States Code furthers that policy and prevents debtors from favoring one creditor over others by allowing a trustee or debtor-in-possession to avoid "preferential transfers." However, § 547(b)'s reach is limited to transfers of "property of the debtor." *Begier* at 2263 and 11 U.S.C. § 547(b).

Because "property of the debtor" is not defined by the Bankruptcy Code, the *Begier* court analogized that concept to the definition of "property of the estate." Whatever was property of a debtor pre-petition becomes property of its bankruptcy estate upon the commencement of the case. Property of a bankruptcy estate does not include an equitable interest in property in which a debtor only holds legal title. 11 U.S.C. § 541(d). If a debtor holds property in trust for another, "that interest is not 'property of the estate.'" *Begier* at 2263.

After examining the relevant portions of the Internal Revenue Code, the *Begier* court concluded that the taxes collected by the debtor were held in trust for the IRS. That statutory trust was created when the taxes were collected on behalf of the IRS. Thus, the debtor held only legal title to the taxes and the monies collected were not "property of the debtor."

*Begier* recognized that, although the trust is created when the taxes are collected or withheld, the trust res (property) still must be identified. Because cash money is a fungible commodity, funds collected lose their separate identity when commingled with other monies. Establishment of a segregated account for the collected tax monies is not a prerequisite to identification of the trust res. *Begier,* 110 S.Ct. at 2264. Rather, a presumption of identification (a "reasonable assumption") is employed. However, this Court believes that presumption or assumption may be rebutted with specific contrary facts.

Initially, the *Begier* court distinguished common law trusts from statutory trusts.

At common law, a settlor creates a trust by identifying specific property. A statutory tax fund trust, however, is created "in an 'abstract amount'—a dollar *figure* not tied to any particular assets—rather than actual dollars withheld." 110 S.Ct. at 2265. Thus, the court concluded that common law tracing rules are "unhelpful in this special context." 110 S.Ct. at 2265.

This "abstract amount," however, still must be "identified" to determine whether the amount transferred was property of the trust or property of the debtor. Ohio contends that by creating a trust in an "abstract amount," the *Begier* court intended to create a "floating trust" that attached to any unencumbered property of a debtor. If the *Begier* court had ended its analysis there, Ohio would be correct. The analysis, however, did not end at that point. Instead, the *Begier* court appears to retreat from such a broad conclusion by requiring the taxing authority to establish a reasonable nexus between the funds collected and the funds transferred by a debtor in payment of its tax obligation. The court directed others "to apply 'reasonable assumptions' to govern the tracing of funds." 110 S.Ct. at 2267. The *Begier* court, thus appears to travel full circle by requiring a reasonable nexus between the payment made and the "abstract amount" of funds which created the trust.

One such "reasonable assumption" is the "voluntary pre-petition payment of trust-fund taxes out of the debtor's assets." *Begier,* 110 S.Ct. at 2267. In *Begier,* the debtor commingled the trust fund taxes with its general operating accounts. By allowing the presumption that a voluntary payment made by the debtor from this account constituted payment of trust property, the taxing authority did not need to "trace" directly the funds collected from those paid. Indeed, such tracing is impossible without the use of presumptions where fungible goods such as money are commingled.

The *Begier* decision is complicated and somewhat confusing. It seems to hold that a taxing authority need only show that a debtor collected or withheld the taxes and

subsequently made a voluntary payment of taxes out of its assets. In the middle of these two conclusory statements, however, the *Begier* court retreats and requires a reasonable nexus or connection between the two events. 110 S.Ct. at 2266. This Court believes *Begier* requires the taxing authority to establish three separate elements to show that funds transferred from a debtor's non-segregated account, and, therefore, presumably the debtor's property, were not the debtor's property for purposes of a preferential transfer under 11 U.S.C. § 547(b).

■ The three elements or factors which the taxing authority must show are:

1. that the debtor collected or withheld the taxes, thus creating a trust in the amount of those taxes collected or withheld;

2. that the debtor made a voluntary payment to the taxing authority from its unencumbered assets; and

3. that a reasonable nexus exists between these first and second steps.

This reasonable nexus will be presumed if the taxing authority establishes that the debtor made a voluntary payment. However, because the *Begier* court established only a presumption or reasonable assumption and not a conclusion, such presumption may be rebutted by evidence which shows that the nexus does not exist.

B. Application of *Begier* To These Facts

*Begier* was a case which involved federal taxes. However, the state sales taxes involved in this proceeding are a similar statutory trust. The parties agreed that the pre-petition payments by WFS to Ohio were on account of sales taxes collected by WFS from its customers and owed to Ohio. Such sales taxes in Ohio are paid by the consumer to the vendor. The governing provision further provides that "each vendor shall collect from the consumer, as trustee for the state of Ohio, the full and exact amount of the tax payable on each taxable sale." Ohio Rev.Code § 5739.03.

WFS does not seriously dispute that it collected the sales taxes in trust for Ohio. Further, the parties stipulated that "WFS collected the applicable tax from consumers on all taxable sales made by it." (Stip. 4) Thus, Ohio has met the first element of the *Begier* test and has shown that the amount collected by WFS created a trust for the benefit of Ohio in the amount of the taxes collected. The parties also stipulated that WFS voluntarily made payment to Ohio on account of those collected sales taxes. Thus, Ohio has also met the second element of the *Begier* test.

The final element Ohio must establish is that a reasonable nexus exists between the funds collected and those subsequently paid to Ohio by WFS. In *Begier* the voluntary payment alone created the reasonable assumption that the funds were trust property and, thus, established the required nexus. This Court believes that a fundamental basis for that "reasonable assumption" in *Begier* arose from the existence of commingled funds in an amount sufficient to satisfy the tax obligation paid and a desire by the court to simplify or eliminate any tracing requirement in that circumstance.

The facts before this Court in this case, however, do not necessarily show payment from an account with sufficient funds to include the collected taxes. Not only did WFS commingle the collected sales taxes with its general operating revenues, but the five HNB accounts where the collected taxes were placed had an aggregate negative balance on May 19, 1987. WFS made the payments to Ohio after this date. (Stip. 7). This crucial factual distinction removes the reasonableness from the assumption created in *Begier*. Here, the difficulty lies not in identifying trust fund taxes within a commingled account, but rather establishing any connection whatsoever between the funds collected and deposited into the HNB accounts prior to May 19, 1987 and the subsequent payments.

Those are the facts before this Court with respect to any sales tax collected and deposited into the HNB accounts before May 19, 1987. As to those funds, Ohio cannot use the reasonable assumption found in *Begier* to establish the required nexus. No connection exists between the

sales taxes collected and deposited in the HNB accounts prior to May 19, 1987 and the subsequent payments of those obligations because, as a factual matter, those tax collections appear to have been largely dispersed by May 19, 1987, when the HNB accounts had an aggregate negative balance. ·

■ Of the total payment made by WFS, $249,492.07 "was paid on account of current sales tax obligations on or before the time payment was required." (Stip. 9). Presumably, this payment represents sales taxes collected and deposited into the five HNB accounts after May 19, 1987. These collected taxes could still have been in those accounts when WFS made the payment, and under *Begier*, WFS' voluntary payment alone supplies the reasonable nexus between the taxes collected in trust and the payment to Ohio. Thus, the $249,492.07 WFS transferred to Ohio on the account of current obligations was not property of WFS, but property of the trust.

Further, these payments were not made on account of an "antecedent debt" because 11 U.S.C. § 547(a)(4) provides: "a debt for a tax is incurred on the day when such tax is last payable without penalty, including any extension." The parties stipulate that the $249,492.07 was paid on the account of current obligations "on or before the time payment was required". (Stip. 9) Accordingly, the $249,492.07 payment was neither made with WFS' property nor on the account of an antecedent debt and, thus, is not a preferential transfer. The avoidability of the remaining $225,507.93 paid to Ohio, however, still must be analyzed under *Begier*.

■ The parties' stipulations indicate that $225,507.93 was paid to Ohio on account of antecedent tax collection debts. (Stip 7). The stipulation fails, however, to break down what portion of those payments represent sales taxes collected and deposited in the HNB accounts before May 19, 1987. Whatever amounts WFS collected and funneled into the HNB accounts before May 19, 1987 cannot be reasonably related to any payments to Ohio except to

the extent of funds then in those accounts. Therefore, payments of those pre-May 19, 1987 taxes were from the debtor's property and were not from the statutory trust to the extent the payments exceeded the amounts actually in the accounts on May 19, 1987. Payments in excess of those actual balances are avoidable as preferential transfers pursuant to 11 U.S.C. § 547(b). Sales taxes deposited into the HNB accounts after May 19, 1987 and commingled with WFS' general revenues are reasonably related to the statutory trust by WFS' voluntary payment to Ohio under *Begier's* "reasonable assumption." Thus, that portion of the $225,507.93 was not a transfer of the debtor's property and not avoidable under 11 U.S.C. § 547(b).

Final resolution of this matter requires the parties to attempt to allocate the $225,507.93 between taxes collected and deposited into the HNB accounts before May 19, 1987 in excess of monies in those accounts on that day and those transferred to the HNB accounts after that date. If agreement of those amounts cannot be reached within 30 days of the entry of this order, the parties should file a written request for an evidentiary hearing before the Court.

In reaching this decision, the Court recognizes the competing policies addressed in *Begier*. Specifically, that court stated that "equality of distribution among creditors is a central policy of the Bankruptcy Code." *Begier*, 110 S.Ct. at 2262. The preference avoidance provisions of 11 U.S.C. § 547(b) further that policy and operate to prevent a debtor from favoring one creditor over another in the final days before its bankruptcy. The payments WFS made to Ohio clearly favored Ohio over WFS' other creditors and allowed Ohio to receive more than it would have in a liquidation proceeding under Chapter 7. (Stip. 13). If equality of distribution were the only policy consideration, therefore, WFS should be entitled to avoid the entire $225,507.93 transfer as preferential.

An equally important policy consideration, however, is WFS' conversion of Ohio's property. WFS collected those taxes on behalf of Ohio and held those funds in

trust. Once collected, those sales taxes belonged to Ohio.

The filing of the bankruptcy petition places the parties in a difference relationship, however. If Congress had intended to "favor" taxing authorities over a debtor's other creditors regardless of necessary factual inferences, such intent would have been stated clearly in the Bankruptcy Code. No such provisions were enacted. If all payments to a taxing authority are conclusively presumed to be from trust funds, regardless of the lack of any reasonable factual nexus, the Court believes corporate debtors may well empty their coffers at the last moment to protect top management to whom the taxing authorities often look for payment of otherwise unpaid trust fund taxes. *See* e.g. 26 U.S.C. § 6471 and Ohio Rev.Code § 5739.33. Such result would be at odds with basic fairness concerns to other creditors and could greatly diminish any return to general creditors. This Court will insist upon clear legislative intent before sanctioning such a result.

### V. *Conclusion*

Of the $475,000 payments WFS transferred to Ohio, the Court finds that the $249,-492.07 payment was not a transfer of WFS' property under *Begier*, nor made on account of antecedent debts as required by 11 U.S.C. § 547(b). *See also,* 11 U.S.C. § 547(a)(4). Accordingly, the debtor may not avoid the transfer of the $249,492.07 as preferential.

The Court further finds that whatever sales taxes WFS collected and deposited into any of the HNB accounts prior to May 19, 1987 were property of WFS when the payments were made to Ohio except to the extent of monies present in the debtor's accounts at HNB on May 19, 1987. All other elements of a preference have been agreed to by the parties. Such transfers, therefore, are voidable as preferences. The presumably small amounts in any of the accounts which had a negative aggregate balance were not the debtor's property under *Begier* and transfers of those funds to Ohio may not be avoided.

The parties are hereby given 30 days to inform the Court whether they can agree on the amount of the sales taxes collected and deposited in the HNB accounts before May 19, 1987 in excess of any amounts remaining in the accounts on that date. If the parties are unable to agree, a written request for an evidentiary hearing should be made. Entry of any final judgment in this adversary action will be deferred until such allocation has been made.

IT IS SO ORDERED.