1. The Fee Motion is granted in part and denied in part.

2. Mr. Shoot is awarded $29,037.50 in fees which will be included in the Final Judgment entered in this proceeding.

## In re SUWANNEE SWIFTY STORES, INC., EIN: 58–0434460, Debtor.

### Suwannee Swifty Stores, Inc., Plaintiff,

### v.

### Georgia Lottery Corporation, Defendant.

Bankruptcy No. 96–60807.
Adversary No. 98–6078.

United States Bankruptcy Court,
M.D. Georgia,
Thomasville Division.

May 17, 2001.

Jonathan H. Alden, Assistant General Counsel, Paul M. Anderson, Anderson & Culliton, PA, Edward A. Dion, James M. Donohue, Edwin R. Hudson, Ronald A. Mowrey, Mowrey & Minacci, P.A., Kenneth G. Oertel, Harold E. Regan, Frederick F. Rudzik, Assistant General Counsel, Florida Dept. of Rev., Tallahassee, FL, Victor Jr. Alexander, Wade G. Anderson, A. Leigh Baier, P.C., Brad A. Baldwin, John B. Ballard, Jr., W. Wright Banks, Jr., Assistant Attorney General, John A. Black, Office of the Solicitor, U.S. Department of Labor, Stephen H. Block, J. William Boone, James C. Cifelli, Mary Grace Diehl, David G. Epstein, King & Spalding, Douglas E. Ernst, James C. Frenzel, Dennis M. Hall, Richard B. Herzog, Jr., Nelson, Mullins, Riley & Scarborough, LLP, Matthew W. Levin, Ronald A. Levine, John G. McCullough, E. Penn Nicholson, Powell, Goldstein, Frazer & Murphy, William Russell Patterson, Jr., William L. Rothschild, Byrne, Eldridge, Moore & Davis, P.C., Brian C. Walsh, King & Spalding, Atlanta, GA, J. Wesley Bailey, St. Petersburg, FL, Terry R. Barnick, Jack W. Carter, Adel,

GA, Douglas A. Baymiller, Huntsville, AL, Jesse G. Bowles, III, Bowles & Bowles, Cuthbert, GA, Andrew William Clark, John Turner Holt, Shelba D. Sellers, Sellers & Mitchell, Thomasville, GA, Richard L. Coleman, Pauline C. Council, J. Stephen Gupton, Jr., J.E. Jarvis, Jr., Valdosta, GA, Richard B. Davis, Jr., Jeffrey R. Dollinger, Scruggs & Carmichael, P.A., Horace Moore, Sr., Gainesville, FL, Timothy O. Davis, Cannon, Meyer von Bremen & Meier, David A. Garland, Robert B. Langstaff, James H. Moore, III, Moore, Clark DuVall & Rodgers, Evans J. Plowden, III, Michael W. Strahan, Vansant, Correre & McCure, P.C., Albany, GA, John D. Emmanuel, Robert L. Olsen, Tampa, FL, Kenneth E. Futch, Blackshear, GA, Roy E. Harkleroad, Douglas, GA, John Flanders Kennedy, Hall, Bloch, Garland and Meyer, Hubert C. Lovein, Jr., Jones, Cork & Miller, John T. McGoldrick, Jr., Martin, Snow, Grant & Napier, Ward Stone, Jr., Stone & Baxter, LLP, Macon, GA, John B. Macdonald, Albert H. Mickler, Richard R. Thames, Jacksonville, FL, Howard S. McKelvey, Jr., Crisp, Oxford, McKelvey & Jones, P.C., Americus, GA, William C. Pound, Fife M. Whiteside, Columbus, GA, Shelley D. Rucker, Nicholas W. Whittenburg, Chattanooga, TN, Randall A. Schmidt, Savannah, GA, C. Gerald Spencer, Quitman, GA, Charles J. Steedley, Homerville, GA, for creditors.

Blank, Rigsby & Meenan, Huey, Guilday & Tucker, Tallahassee, FL, Fisher & Phillips, Atlanta, GA, Gardner, Willis, Sweat & Goldsmith, Albany, GA, Gierach and Gierach, Orlando, FL, Jerome L. Kaplan, James P. Smith, Macon, GA, Timothy M. Wright, Valdosta, GA, for debtors.

### MEMORANDUM OPINION

JOHN T. LANEY, III, Bankruptcy Judge.

On September 21, 2000, the court held a hearing on cross motions for summary judgment regarding Debtor's complaint against Georgia Lottery Corporation ("GLC") to recover post-petition transfers under § 549 and § 550 of the Bankruptcy Code ("Code"). The parties filed briefs, reply briefs, affidavits, and a final pretrial order. At the conclusion of the hearing, the court took the motions for summary judgment under advisement. The court has considered the evidence, affidavits, and the parties' briefs and oral arguments, as well as the applicable statutory and case law. For reasons that follow, the court will grant GLC's motion for summary judgment and will deny Debtor's motion for summary judgment. Accordingly, the court will not allow Debtor to recover the post-petition transfers.

### FACTS

Debtor operated approximately 109 retail stores in South Georgia and North Florida. Seventy of these stores were located within the state of Georgia. On September 17, 1993, Debtor entered into a Retailer Contract with GLC for the sale of On–Line lottery tickets in connection with the State of Georgia's Lottery. On October 19, 1994, Debtor entered into another Retailer Contract with GLC for the sale of Instant Game lottery tickets ("Instant Tickets"). In addition to the terms of each contract, the course of dealings between Debtor and GLC were governed by the Georgia Lottery for Education Act ("Lottery Act"). O.C.G.A. § 50–27–1 (1982 & Supp.2000) et seq. Pursuant to the Lottery Act, GLC may establish rules, policies, and procedures regulating the conduct of lottery games. O.C.G.A. § 50–27–10.

On December 12, 1996, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code. On December 11, 1998,

Debtor filed this adversary proceeding. Only the Instant Ticket transactions are at issue in this proceeding. Therefore, the procedure by which the Instant Tickets were provided to and sold by Debtor is pertinent to the analysis.

Pursuant to GLC's Policies and Procedures, Instant Tickets are delivered to the retailer in packs which are assigned a bar code so that the retailer can scan them for status purposes. Upon shipment to the stores, but before they are delivered, Instant Ticket packs maintain the status of "Issued." An "Issued Pack" is one which has been assigned and shipped to a specific retailer. Once a pack has been delivered, the retailer is required to scan the pack thereby changing the status from "Issued" to "Confirmed." Scanning is done with a bar code reader at the retailer's location which is connected on-line to GLC. "Confirmation" of a pack is absolute proof that the retailer has received the pack from GLC.

Prior to the sale of an individual Instant Ticket from a "Confirmed" pack, the retailer is again required to change the status of the pack from "Confirmed" to "Activated." This is done by scanning the pack a second time. An "Activated" pack indicates to GLC that Instant Tickets are being sold from that pack.

The status of an "Activated" pack changes to "Settled" on the earlier of either (1) 21 days after "Activation"; or (2) the date the retailer consciously makes a choice to "Settle" a pack, whether the Instant Tickets have been sold or not. A "Settled" pack enables GLC to bill (or "Settle") the retailer's account.

The Lottery Act and the Retailer Contract also require that the retailer maintain a separate Trust Account at Bank of America ("BOA") to deposit proceeds from the sale of Lottery tickets. O.C.G.A. § 50–27–2. On the Tuesday following any fiscal week, which ran from Sunday through Saturday, GLC electronically sweeps the Instant Total[1] and On-line Total from the account. The Lottery Act and regulations further require the retailer to deposit proceeds into this Trust Account no later than the next business day after the sale of the Instant Tickets.

However, Debtor did not deposit the proceeds from the sale of Instant Tickets on a daily basis, a fact which is not in dispute. Although Debtor maintained a separate Trust Account at BOA located in Albany, Georgia, each of Debtor's retail stores maintained a separate "store account" in the community where the store was located. Each store deposited all of its general receipts as well as proceeds from lottery ticket sales into its store account. On the day prior to GLC's weekly sweep of the Trust Account, GLC routinely advised Debtor, by facsimile, of the amount that was going to be swept. Upon receipt of this weekly facsimile from GLC, Debtor withdrew funds from other accounts and deposited into the Trust Account the amount to be swept.

During the fiscal week covering the period that Debtor filed its voluntary petition, commencing December 8, 1996 and ending on December 14, 1996, ("Week I"), Debtor "settled" $201,600.00 in Instant Ticket sales. During Week I, Debtor was credited with $13,133.00 for Returns, $114,060.00 for Validations, $9,840.30 for Sales Commissions, and $2,281.20 for Cashing Commissions. ("applicable credits"). Accord-

---

**1.** The *Instant Total* is the amount swept each week which represents the amount "Settled" less *Returns* (tickets returned to GLC by Debtor), less *Validations* (cash payments to winners), less *Sales Commissions* (Debtor's commission for selling tickets), less *Cashing Commissions* (Debtor's 2% commission for cashing winning tickets).

ingly, the amount to be swept for Instant Tickets was $62,285.50.[2] This sweep failed because of the lack of funds in the Trust Account. (Pretrial Order Exh. "D").

Because Debtor filed its voluntary petition on December 12, 1996, both Debtor and GLC agreed to pro-rate Instant and On-line Ticket sales as of the close of business on December 11, 1996. (Stipulation of Facts, Doc. No. 58). Of the $158,864.24 due to GLC, $72,186.74 was due for the period of December 8, 1996 through December 11, 1996. Therefore, on December 18, 1996, Debtor wire transferred to GLC $86,677.50 out of its general operating account. This left a balance of $72,186.74.[3]

Between December 15, 1996 and December 21, 1996, ("Week II"), Debtor settled $191,700.00 in Instant Tickets. After the applicable credits were applied, a balance due of $61,902.48 resulted, which GLC swept from the Trust Account on December 24, 1996.

During the next fiscal week commencing on December 22, 1996 and ending on December 28, 1996, ("Week III"), Debtor settled $193,800 .00 in Instant Ticket Sales. The amount of $68,785.02 was the resulting balance due after applicable credits were applied. On December 31, 1996, GLC swept this amount from the Trust Account.

Between December 29, 1996 and January 1, 1997, ("Week IV"), $107,100.00 in Instant Tickets were settled. After applicable credits were applied, a balance of $43,904.22 resulted which was swept from the Trust Account by GLC on January 7, 1997. Although Week IV is not a full week, January 1, 1997 was the last day of the 21–day period for which any Instant Ticket packs that were activated pre-petition could have been settled. However, neither party can point to any evidence indicating to what extent Instant Tickets, which were activated pre-petition, were sold pre-petition or post-petition. (Pretrial Order, pp. 17).

On December 17, 1996, the court entered an order allowing Debtor to use cash collateral to pay operating expenses, which included disbursements to GLC. (Doc. No. 39). On January 6, 1997, the court entered a similar order Authorizing Continued Use of Cash Collateral. (Doc. No. 100). This latter order expired on January 23, 1997.

On December 24, 1996, after a preliminary hearing on Debtor's Motion to Assume Executory Contracts, the court entered an order allowing Debtor to continue selling lottery tickets under its contract with GLC. (Doc. No. 67). In this order, the court found that Debtor owed GLC "approximately $73,000.00" for pre-petition lottery sales. *Id.* Similarly, on March 3, 1997, the court entered an Interim Order allowing Debtor to operate as a lottery retailer. (Doc. No. 266). Furthermore, this order set Plaintiff's total pre-petition arrearage to GLC at $72,187.00. *Id.*

On December 11, 1998 Debtor filed its complaint to recover post-petition transfers. Debtor asserts that funds transferred to GLC during Weeks I through IV were on account of pre-petition Instant Ticket sales. Because Instant Tickets are

---

**2.** The Instant Total amount added to $96,578.74, the On-line Total for that week, resulted in $158,864.24; the total amount to be swept on that date. Also, on January 30, 1997, Thomas A. Schroeder, an in-house attorney with GLC, transmitted a facsimile to Debtor's Chief Operating Officer, Wayne Boone, detailing Instant and On-line transactions for Week I.

**3.** Of the $72,186.74, $29,711.34 was on account of Instant Tickets and $42,475.40 was on account of On-line Tickets. (Pretrial Order, Exh. "E").

not settled until 21 days after they are activated, Debtor maintains that any Instant Tickets settled during this time period were activated (i.e., sold) pre-petition. Based on this, Debtor contends that the pre-petition arrearage owed to GLC on account of Instant Ticket sales is $562,787.06, not $29,711.34. Accordingly, Debtor maintains that $533,075.72 was erroneously paid which is recoverable as property of the estate.

GLC contends that the pre-petition arrearage amount of $72,186.74, of which $29,711.34 was on account of Instant Tickets, is the correct figure. GLC maintains that this pre-petition figure was determined by the court in its March 3, 1997 order. Moreover, all post-petition transfers were on account of post-petition sales which were authorized by the court. Furthermore, it is GLC's position that all Instant Tickets and the proceeds from the sale of Instant Tickets are property of a trust and therefore, cannot be property of the estate. Debtor, however, maintains that any trust character was destroyed due to the commingling of the ticket sales proceeds with its stores' general receipts.

### DISCUSSION

In dealing with cross motions for summary judgment in a contested matter, Federal Rule of Bankruptcy Procedure 9014 incorporates Federal Rule of Bankruptcy Procedure 7056, which in turn incorporates Federal Rule of Civil Procedure 56. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED R. CIV. P. 56(c). An issue is "material" if it affects the outcome of the case under the applicable law. *Redwing Carriers, Inc. v.*

*Saraland Apartments,* 94 F.3d 1489, 1496 (11th Cir.1996)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In this case, the applicable law is § 549 and § 550 of the Code. Under those sections, only the transfer of property of the estate may be avoided and recovered. Therefore, the central issue to be determined by the court is whether the post-petition transfers to GLC on December 18, 1996, December 24, 1996, January 7, 1997, and January 14, 1997, were subject to a trust, thus excluding the transfers from the property of the estate. *See United States v. Whiting Pools, Inc.,* 462 U.S. 198, 205, n. 10, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983)(noting that property held in trust for a third party does not become property of the estate).

In determining whether the transferred funds were subject to a trust, the court must first determine whether a trust existed. This inquiry requires looking to the language of the Lottery Act, which provides in part:

> "All proceeds from the sale of lottery tickets or shares shall constitute a trust fund until paid to the corporation.... Proceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds of the sale of any lottery products, net of allowable sales commissions and credit for lottery prizes."

O.C.G.A. § 50–27–21(a).

The Lottery Act also requires retailers to deposit all lottery proceeds in a separate trust account, which "[a]t the time of such deposit, lottery proceeds shall be deemed to be the property of the corporation." O.C.G.A. § 50–27–21(b).

■ The court finds that O.C.G.A. § 50–27–21(a) creates a statutory trust in favor of GLC. *See Georgia Lottery Corporation v. Daniel (In re Daniel),* 225 B.R. 249,

251–52 (Bankr.N.D.Ga.1998)(holding that § 50–27–21 sets forth all the elements of a technical trust). As far as what constitutes property held in trust for GLC, the plain language of O.C.G.A. § 50–27–21(a) is clear. "All proceeds ... shall constitute a trust ... [and] [p]roceeds shall include unsold instant tickets received by a lottery retailer and cash proceeds ... net allowable sales commissions and credit[s]...." O.C.G.A. § 50–27–21(a). Because GLC's Policies and Procedures define "Confirmed" Instant Tickets as absolute proof that the retailer has received the tickets, the courts finds that, in addition to tickets sold, all tickets "Confirmed" constitute property held in trust. Next, the court must determine whether the funds transferred to GLC during Weeks I through IV were subject to the statutory trust.

■ Debtor argues that any trust character of the funds was destroyed when Debtor commingled Instant Ticket sales proceeds with Debtor's general store account funds. Debtor further asserts that the trust fails because there is no identifiable trust res. Research has produced no cases on this precise point. Therefore, this is an issue of first impression for the court. However, the court agrees with GLC and finds that *Begier v. Internal Revenue Service* is instructive. 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990).

In *Begier*, the United States Supreme Court analyzed an avoidance action as to payments that were made to the Internal Revenue Service ("IRS") pursuant to a statutorily created trust in the tax code. Affirming the Third Circuit, the Supreme Court held that the funds paid to the IRS were not property of the debtor; they were held in trust for the IRS. *Id.* at 55, 110 S.Ct. 2258. Accordingly, the Court held that the trustee could not recover the funds. *Id.*

At the onset, the court disagrees with Debtor that *Begier* is inapplicable in this case. Admittedly, the court recognizes that *Begier* involved a trust created by the tax code and the Bankruptcy Code gives special attention to taxes. However, that fact is inconsequential in this analysis. The central underlying issue in *Begier*, whether such transfers were property of the debtor, is directly applicable to this court's determination of whether Debtor's transfers were property of the estate. *See id.* at 65, 110 S.Ct. 2258 (explaining that " 'property of the debtor' is property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings."). Moreover, the mere fact that *Begier* dealt with alleged preferential prepetition transfers under § 547 of the Code and the present case deals with § 549 post-petition transfers, has no bearing on the property of the estate analysis.

American International Airlines ("AIA"), the debtor in *Begier*, fell behind in its prepetition "trust fund taxes" to the IRS.[4] Pursuant to § 7512 of the Internal Revenue Code, the IRS subsequently ordered AIA to deposit the trust fund taxes in a separate account because of AIA's default. AIA established the account but instead of depositing into the separate account all of the funds that it collected, AIA commingled some of the trust fund taxes with general operating funds. Nonetheless, AIA remained current to the IRS by making payments from both the separate ac-

---

4. Pursuant to § 7501 of the Internal Revenue Code, excise taxes collected from customers and income taxes withheld from another's pay, "shall be held to be a special fund in trust for the United States." 26 U.S.C. § 7501. Therefore, these taxes are often called "trust fund taxes." *See Slodov v. United States*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978).

count and its general operating funds. *Id.* at 56, 110 S.Ct. 2258.

Relying on the language of § 7501 of the Internal Revenue Code, the Supreme Court held that the statutory trust extends to "the amount of tax so collected or withheld." *Id.* at 60, 110 S.Ct. 2258. AIA was required to withhold incomes taxes from its employees' pay and collect excise taxes from its customers for the benefit of the IRS. Therefore, the Court held that a trust in the amount withheld or collected was created at the moment AIA paid its employees and at the moment customers paid AIA. *Id.* at 61, 110 S.Ct. 2258. The trustee argued that no trust was created because AIA never segregated the funds into a separate account. However, the Supreme Court rejected this argument and held that nothing in § 7501 indicates an intent of Congress that the IRS is "protected only insofar as dictated by the debtor's whim." *Id.* If the trustee's proposition were true, the Court noted that an "employer could avoid the creation of a trust simply by refusing to segregate." *Id.*

This conclusion, however, did not fully resolve the issue of whether the funds transferred from AIA's general operating fund were trust property. Looking to the common law of trusts, the Court explained that a trust is created in property which comes into being only upon the identification of trust property or trust res. *Id.* However, the Court found the common law definition to be "unhelpful" given the fact that a trust created under § 7501 creates a trust in an abstract "amount" instead of in particular property. *Id.* Therefore, the Court determined that the IRS must "show some connection ('reasonable assumption') between the § 7501 trust and assets sought to be applied to debtor's trust-fund tax obligations." *Id.* at 65–66, 110 S.Ct. 2258. In other words, there

must be some nexus between the trust and funds transferred in order for the transferred funds to be excluded from property of the estate. The Court concluded that the voluntary payment of trust fund taxes, regardless of the source of the funds, provides the necessary nexus. *Id.* at 66–67, 110 S.Ct. 2258.

In the present case, Debtor argues that the "nexus" espoused in *Begier* is a presumption which is rebuttable. *See Wendy's Food Systems, Inc. v. State of Ohio Dep't of Taxation (In re Wendy's Food Systems),* 133 B.R. 917 (Bankr.S.D.Ohio 1991). However, a bankruptcy court in this jurisdiction has held that a debtor's voluntary payment conclusively establishes the nexus set forth in *Begier. See Wasden v. Florida Dep't of Revenue (In re Wellington Foods, Inc.),* 165 B.R. 719 (Bankr. S.D.Ga.1994).

In *In re Wendy's Food Systems ("WFS"),* the debtor, WFS, was required to collect state sales taxes which were to be held in trust pursuant to Ohio law. During the pre-petition preference period, WFS made a voluntary payment to the taxing authority. WFS sought to recover these payments. Because the taxes which WFS collected were commingled with general operating funds, the state taxing authority argued that *Begier* was applicable.

Construing *Begier,* the bankruptcy court held that the "reasonable assumption" (or presumption) that a voluntary payment provides the required nexus to the trust, may be rebutted with contrary evidence. *Wendy's Food Systems,* 133 B.R. at 920. According to the court in *Wendy's Food Systems,* the Supreme Court in *Begier* rendered a narrow ruling specific to the facts of that case. *Id.* at 921. The court explained that the voluntary payment in *Begier* was presumed to provide the nexus to the trust because there was a sufficient amount of funds in the commingled ac-

count to satisfy the tax obligation. *Id.* However, in *Wendy's Food Systems,* WFS's commingled account had a balance below the amount which was transferred to the taxing authority. The court held that this "distinction remove[d] the reasonableness from the assumption created in *Begier." Id.* The court read *Begier* as requiring the commingled account to have a balance equal to or greater than the amount transferred in order for a voluntary payment to have a sufficient nexus to the trust. Moreover, to the extent that the transferred amount is greater than the commingled account balance, that amount is not property of the trust therefore, rendering it avoidable by WFS. *Id.* at 921–22.

In the case before the court, Debtor argues that *Wendy's Food Systems* is applicable. Evidence presented demonstrates that Debtor's store accounts and concentration accounts had negative balances at all times relevant to the transfers. (GLC's Br. Exh. "G"). Relying on *Wendy's Food Systems,* Debtor maintains that this evidence rebuts the presumption that Debtor's voluntary payment to GLC was sufficiently connected to the trust.

The court in *In re Wellington Foods,* however, rejected the holding in *Wendy's Food Systems* that *Begier* was a narrow decision limited to specific facts. 165 B.R. at 726. In *Wellington Foods,* Chief Judge Davis recognized the holding of *Wendy's Food Systems* to be the common-law tracing doctrine known as the "lowest intermediate balance." *Id.* Although the Supreme Court was not faced with an intervening balance issue in *Begier,* Judge Davis held that *Begier* is not restricted to cases where the debtor has sufficient funds in its accounts to cover trust fund tax payments. *Id.* To Judge Davis, this point was clear

given the Supreme Court's language that the voluntary payment could not be avoided "regardless of the source of the funds." *Id.* (citing *Begier,* 496 U.S. at 66–67, 110 S.Ct. 2258). Therefore, the court held that "the conclusive presumption arises upon voluntary payment, regardless of the source of the payment and regardless of any intervening balance in the debtor's aggregate operating accounts." *Id.*

The court in *Wellington Foods* further supported its conclusion by relying on two cases involving trust fund taxes.[5] In each case, the court applied the "lowest intermediate balance" test. However, the debtors in both of these cases did not make a voluntary payment. As Judge Davis explained, the voluntary payment "is a critical factual distinction [which goes to] ... the very heart of the Supreme Court's opinion in *Begier....*" Furthermore, the Supreme Court made a reference to *In re R & T Roofing* and noted that case as being merely "related" to the issue before the Court because it did not involve a voluntary payment. *Id.* (citing *Begier,* 496 U.S. at 57, n. 12, 110 S.Ct. 2258).

Therefore, absent the act of making a voluntary payment, the court held that there is no conclusive presumption of the required nexus, thus the lowest intermediate balance rule is applicable. *Id.* at 728. However, where a voluntary payment has been made, "such payment will be conclusively presumed to be from the corpus of the trust." *Id.*

The court agrees with the reasoning in *Wellington Foods* and likewise, finds that a voluntary payment conclusively presumes that such payment is property of the trust. Accordingly, the court rejects the reasoning in *Wendy's Food Systems*

---

5. *See United States v. Daniel (In re R & T Roofing Structures & Commercial Framing, Inc.),* 887 F.2d 981 (9th Cir.1989); *In re Cope-* *land Enterprises, Inc.,* 133 B.R. 837 (Bankr. W.D.Tex.1991) *aff'd,* 991 F.2d 233 (5th Cir. 1993).

that this presumption is rebutted because the trust account balance fell below the amount of the payment. As the Supreme Court in *Begier* held, the trust is created in an "abstract amount" and "regardless of the source of the funds." *Begier* at 62, 66–67, 110 S.Ct. 2258.

Moreover, the "conclusive presumption" of a voluntary payment is consistent with the presumption applied in constructive trust cases where the trustee commingles trust funds with that of his own.[6] *See Bethlehem Steel Corp. v. Tidwell,* 66 B.R. 932, 942 (M.D.Ga.1986)(holding that "[w]hen a trustee replenishes a commingled account which has fallen below the amount held in trust, the trustee is presumed to return the beneficiary's money first. . . ."). Just as funds that replenish a commingled account are presumed to be trust property (i.e., beneficiary's property), funds that are voluntarily paid to the trust beneficiary are likewise presumed to be trust property.

 Applying the rule in *Begier* to the instant case, the court finds that the funds which Debtor transferred post-petition to GLC were property of the statutory trust. Although Debtor transferred these funds from its commingled general operating accounts, these payments were voluntary payments. Therefore, pursuant to *Begier* and *Wellington Foods,* these payments are conclusively presumed to be sufficiently connected to the trust. No doubt exists that a voluntary payment was made for Week I; once the sweep failed, Debtor wire transferred the funds directly to GLC. During Weeks II, III, and IV, however, Debtor made deposits in the trust account which was swept by GLC. Nevertheless, the court finds that these transfers were voluntary. Just because Debtor did

not directly transfer the funds to GLC, Debtor voluntarily deposited the funds in the Trust Account in order for GLC to conduct the sweep.

Moreover, these facts are similar to *Bethlehem Steel.* The commingled account in that case had very little funds which was later replenished by the debtor with other funds. The court held that the replenished funds were presumed to be property of the trust. 66 B.R. at 942. Similarly, the Trust Account in the instant case had no funds. Debtor deposited funds in order for GLC to conduct the sweeps. Pursuant to the presumption of *Bethlehem Steel,* the court finds that the deposits constitute replenished funds which are property of the trust.

Based on the above findings, the $533,075.72 which Debtor maintains was erroneously paid to GLC, are "proceeds" held in trust for GLC. These funds are not property of the estate. Accordingly, Debtor may not recover these funds under § 549 and § 550 of the Code. Therefore, the court will grant GLC's motion for summary judgment and will deny Debtor's motion for summary judgment.

GLC prayed for an award of attorney's fees, but has cited no authority in support of the same. Therefore, judgment will be rendered in favor of GLC and against Debtor with costs of this action.

An order in accordance with this Memorandum Opinion will be entered.

---

6. Although constructive trusts are formed as an equitable remedy while statutory trusts are creatures of statute, the court finds that this distinction is immaterial in determining what constitutes trust property.